HAMILTON, COLLECTOR OF INTERNAL REV-
ENUE FOR THE COLLECTION DISTRICT OF
KENTUCKY, v. KENTUCKY DISTILLERIES &
WAREHOUSE COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF KENTUCKY.

DRYFOOS ET AL. v. EDWARDS, COLLECTOR OF
INTERNAL REVENUE FOR THE SECOND COL-
LECTION DISTRICT OF NEW YORK.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 580, 602.    Argued November 20, 1919.—Decided December 15,
1919.

The power to prohibit the liquor traffic as a means of increasing war
efficiency is part of the war power of Congress, and its exercise with-
out providing for compensation is no more limited by the Fifth
Amendment than a like exercise of a State's police power would be
limited by the Fourteenth Amendment.  P. 154.

The War-Time Prohibition Act, approved ten days after the armistice
with Germany was signed, Act of November 21, 1918, c. 212, 40
Stat. 1046, provided: "That after June thirtieth, nineteen hundred
and nineteen, until the conclusion of the present war and there-
after until the termination of demobilization, the date of which
shall be determined and proclaimed by the President of the United
States, for the purpose of conserving the man power of the Nation,
and to increase efficiency in the production of arms, munitions, ships,
food, and clothing for the Army and Navy, it shall be unlawful to
sell for beverage purposes any distilled spirits, and during said
time no distilled spirits held in bond shall be removed therefrom for
beverage purposes except for export."  Held, in respect of liquors in
bond, even if belonging to one who made and owned them before the

act was passed and paid revenue taxes upon them since June 30, 1919:

(1) That the act was not an appropriation of such liquors for public purposes. P. 157.

(2) That the time allowed for disposing of all liquors in bond on November 21, 1918, could not be declared unreasonable, as a matter of law, even if they were not sufficiently ripened or aged to be disposed of advantageously during the period limited. P. 158.

(3) That the prohibition was not in violation of the Fifth Amendment as a taking of property without compensation. P. 157.

(4) That it was within the war power when passed (notwithstanding the cessation of hostilities under the armistice), as a means of war efficiency and for the support and care of the Army and Navy during demobilization. P. 158.

A wide latitude of discretion must be accorded to Congress in the exercise of the war powers. P. 163.

The court cannot inquire into the motives of Congress, in determining the validity of its acts, or into the wisdom of the legislation; nor pass upon the necessity for the exercise of a power possessed. P. 161.

It is settled that the war power carries with it the power to guard against immediate renewal of the conflict and to remedy the evils which have arisen from its rise and progress. *Id.*

Assuming that the continuing validity of an act passed under the war power may depend not upon the existence of a technical state of war, terminable only with the ratification of a treaty of peace or by a proclamation of peace, but upon some actual war emergency or necessity, the court cannot say that the necessity for the prohibition had ceased when these suits were begun, in view of the facts that the treaty of peace has not been concluded, that various war activities,—among them national control of railroads,—continue, and that the man power of the nation has not been completely restored to a peace footing. P. 161.

The Eighteenth Amendment did not operate to repeal the War-Time Prohibition Act. P. 163.

In defining the period of the prohibition, Congress in the War-Time Prohibition Act, doubtless expecting that the war would be definitely ended by a peace under a ratified treaty or a proclamation before demobilization was complete, intended that the prohibition should continue until the date of the termination of demobilization had been definitely ascertained by the President and made known by him through a proclamation to that end. P. 164.

The reference to the "demobilization of the army and navy," in the

President's message communicating his veto of the National Pro-
hibition Act, is not the proclamation required by the War-Time
Prohibition Act. P. 167.

In an exact sense, demobilization had not terminated then or when
these suits were begun, as is shown by the report on the subject of
the Secretary of War, made to the President and transmitted to Con-
gress; nor does it appear that it has yet so terminated. P. 168.

No. 589. Reversed.
No. 602. Affirmed.

THE cases are stated in the opinion.

*The Solicitor General* and *Mr. Assistant Attorney General
Frierson*, with whom *Mr. W. V. Gregory* was on the briefs,
for appellant in No. 589 and appellee in No. 602.

*Mr. Levy Mayer* and *Mr. William Marshall Bullitt* for
appellee in No. 589:

Congress has no power to prohibit the sale of whisky
within a State, except under its war powers. By the
Tenth Amendment the States reserved to themselves the
police power over the liquor traffic with the right to abolish
future manufacture, sale or possession. This power is
absolute and exclusive, since, as before, the Fourteenth
Amendment. But it is still an open question whether
a State can make unlawful the possession, use or sale
of liquors lawfully acquired (as in the present case) before
the passage of the prohibitory statute. *Bartemeyer* v.
*Iowa*, 18 Wall. 129; *Beer Co.* v. *Massachusetts*, 97 U. S.
25; *Eberle* v. *Michigan*, 232 U. S. 700, 706; *Barbour* v.
*Georgia*, 249 U. S. 454, 459; *Wynehamer* v. *People*, 13
N. Y. 378.

Congress can waive the interstate character of liquor in
order to subject it to the laws of a State when once in-
troduced therein, or can prohibit its transportation to a
State where its possession is prohibited. *In re Rahrer*, 140
U. S. 545; *Clark Distilling Co.* v. *Western Maryland Ry.
Co.*, 242 U. S. 311, 323. But Congress has no power, in
peace time, to prohibit the sale of whisky. *In re Rahrer*,

140 U. S. 545, 554; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 667; *Matter of Heff*, 197 U. S. 488, 505; *Hammer* v. *Dagenhart*, 247 U. S. 251, 273–276; *Keller* v. *United States*, 213 U. S. 138, 144, 148.

In order to guard and promote the health, welfare and efficiency of the men composing the army and navy, and to increase the efficiency of the workers in the production of arms, munitions, ships, food and clothing for them, Congress has the right temporarily to regulate the sale of liquor, and, if reasonably necessary to accomplish such objects, to forbid its sale. *McKinley* v. *United States*, 249 U. S. 397, 399; *Selective Draft Law Cases*, 245 U. S. 366; *Schenck* v. *United States*, 249 U. S. 47, 52; *Grancourt* v. *United States*, 258 Fed. Rep. 25; *United States* v. *Casey*, 247 Fed. Rep. 362; *Pappens* v. *United States*, 252 Fed. Rep. 55. But the exercise of this power, like all others, is subject to the Fifth Amendment. *Ex parte Milligan*, 4 Wall. 2; *Johnson* v. *Jones*, 44 Illinois, 142; *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 336; *McCray* v. *United States*, 195 U. S. 27, 61. It necessarily follows that if, in the exercise of the war power, private property is taken, the owner thereof is entitled to just compensation therefor.

Whisky is property and when taken for public use is entitled to the protection of the Fifth Amendment. *Leisy* v. *Hardin*, 135 U. S. 100, 110; *Wynehamer* v. *People*, 13 N. Y. 378, 383, 384; *Commonwealth* v. *Campbell*, 133 Kentucky, 50; *Barber* v. *Commonwealth*, 182 Kentucky, 200; *Commonwealth* v. *Kentucky Distilleries & Warehouse Co.*, 143 Kentucky, 314.

The War-Time Prohibition Act takes appellee's private property for public use, but makes no provision for just compensation to the owner. Therefore, the act is unconstitutional. The act prohibits appellee from either selling the whisky which it has in its own possession fully tax paid, or obtaining possession of its property which is in

the Government's bonded warehouses. The effect is that the appellee has been deprived of every attribute of ownership, except the necessity of paying taxes to the United States upon the very property which the Government refuses to allow the owner to use or sell. If this does not constitute a taking of a person's property, the English language has lost its meaning. *Buchanan* v. *Warley*, 245 U. S. 60, 74, 81; *Wynehamer* v. *People*, 13 N. Y. 387, 389, 396, 398; *Foster* v. *Scott*, 136 N. Y. 577; *United States* v. *Cress*, 243 U. S. 316; *United States* v. *Lynah*, 188 U. S. 445. The appellee was required by the federal statute to provide, at its own expense, bonded warehouses, which were under the exclusive control of the Government. *Taney* v. *Penn National Bank*, 232 U. S. 174; *Dale* v. *Pattison*, 234 U. S. 399. By statute, it was also authorized to leave its whisky in bond for eight years, and to bottle it in bond at any time after the first four years. The whisky in question was rightfully in appellee's bonded warehouses and it had the right to rely upon the "bottling in bond statute," and furthermore it could not have bottled a large part of the whisky because it had not been in the warehouses four years at the time the War Prohibition Act was enacted. It is therefore no answer to suggest that the appellee should have withdrawn the whisky from bond and sold the same before the War Prohibition Act was enacted. As the taking is solely under the war power, it is concededly for a public use. No provision for any compensation was made; but, on the contrary, Congress (February 24, 1919) imposed a heavy retroactive tax (double the then existing tax) on all whisky, including that already tax-paid; the tax was assessed and collected; and the owners are now prohibited from selling the very whisky on which they have paid that tax, a large part of which the appellee was compelled to pay as late as September 24, 1919. It is a false analogy to say that under the war power Congress is endowed with what are commonly

called the police powers of the States and consequently may exercise them as unlimitedly as do the States.  For the police powers of the States are not subject to the Fifth Amendment, whereas the war powers of Congress are.   It has not been decided that even the state police powers may prohibit sale of liquor made before the passage of the law.  While it is true that Congress' exercise of the war power can accomplish anything which the States can accomplish under their police power, yet the qualifications imposed thereon are different.  It may not, for instance, require excessive bail, refuse a public trial in a criminal case, or cause the accused to be a witness against himself. The instances might be multiplied where States are free in the exercise of their police powers, from requirements to which Congress, even in the exercise of its war power, is subject.   The law is abundantly settled that while the Fifth Amendment does not require that the just compensation shall be actually paid in advance of the taking, nevertheless, the owner is entitled to some reasonable, certain and adequate provision for obtaining such compensation before his ownership or possession can be interfered with.

The War-Time Prohibition Act has, by its own terms, ceased to be operative.  The evil sought to be remedied was the danger of intoxication of soldiers, sailors and war workers during the war and during the subsequent period of demobilization.  Cong. Rec., vol. 56, pp. 9627, 9641. Demobilization is the act of disbanding troops; the reduction of military armaments to a peace footing.  Century Dictionary; 18 Corpus Juris, 484; Cong. Rec., *loc. cit.*

The President's acts and declarations amount to a proclamation of "the date of the conclusion of the present war," in the sense of actual hostilities, and *thereafter* the "termination of demobilization."  [Counsel quoted also statements made by the War Department and by General Pershing, to the effect that demobilization was at an end.]

The demobilization process has continued steadily until the strength of both the army and navy has been reduced to less than the authorized peace quota. The production of war munitions has stopped, all existing contracts have been canceled and the Government is actively disposing of its surplus war supplies of arms, munitions, food and clothing, etc.

What is meant by "conclusion of the present war" must be determined by the purpose of this particular act, and the evident belief of Congress that the ending of the war would precede demobilization. Cases like *Hijo* v. *United States*, 194 U. S. 315, holding war existent until ratification of peace, are inapplicable. That Congress purposely did not intend to make the "conclusion of the present war" dependent upon any treaty of peace is illustrated by a comparison of the language of this act with that of other war legislation wherein the "end of the war" was involved.

A foreign war may not be terminated in respect of various considerations arising under international law and yet be concluded in respect of the rights and duties of citizens of the United States under the Federal Constitution; and it does not follow that because a technical state of war still prevails between the United States, Germany and Austria, notwithstanding the complete demobilization of our army and navy, the constitutional rights of the citizens of the United States are to be tested as if war actually existed. It is not necessary that there should ever be a definite treaty of peace. History presents many instances where there has been a "conclusion of war" without any treaty of peace. Whether or not war has been terminated is, after all, a question of fact to be determined in each case by the situation presented.

The War-time Prohibition Act has become obsolete with the passing of the emergency [citing various rate cases, and the *Perrin* and *Gearlds Case*, which are considered in the court's opinion, *infra*, 162].

*Mr. Walter C. Noyes,* with whom *Mr. Moses J. Stroock, Mr. Arthur L. Strasser* and *Mr. Walter S. Dryfoos* were on the brief, for appellants in No. 602.

*Mr. Wayne B. Wheeler* and *Mr. R. C. Minton,* by leave of court, filed a brief as *amici curiæ* in No. 589.

*Mr. Levi Cooke* and *Mr. George R. Benneman,* by leave of court, filed a brief as *amici curiæ* in No. 602.

Mr. Justice Brandeis delivered the opinion of the court.

The armistice with Germany was signed November 11, 1918. Thereafter Congress passed and, on November 21, 1918, the President approved the War-Time Prohibition Act (c. 212, 40 Stat. 1045, 1046), which provides as follows:

"That after June thirtieth, nineteen hundred and nineteen, until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States, for the purpose of conserving the man power of the Nation, and to increase efficiency in the production of arms, munitions, ships, food, and clothing for the Army and Navy, it shall be unlawful to sell for beverage purposes any distilled spirits, and during said time no distilled spirits held in bond shall be removed therefrom for beverage purposes except for export. . . ."

On October 10, 1919, the Kentucky Distilleries and Warehouse Company, owner of distillery warehouses and of whisky therein, brought in the District Court of the United States for the Western District of Kentucky a suit against Hamilton, Collector of Internal Revenue for that District, alleging that the above act was void or had become inoperative and praying that he be enjoined from interfering, by reason of that act, with the usual process of

withdrawal, distribution and sale of the whisky in bond. The case was heard before the District Judge on plaintiff's motion for a preliminary injunction and defendant's motion to dismiss. A decision without opinion was rendered for the plaintiff; and, the defendant declining to plead further, a final decree was entered granting a permanent injunction in accordance with the prayer of the bill. A similar suit seeking like relief was brought on October 29, 1919, by Dryfoos, Blum & Co., in the District Court of the United States for the Southern District of New York, against Edwards, Collector for that District. That case was heard on November 5 before the District Judge on like motions for a preliminary injunction and to dismiss. An opinion was filed November 14, 1919, holding the act in force; and on the following day a final decree was entered dismissing the bill.

The essential facts in the two cases differ in this: In the Kentucky case the whisky was stored in a distillery warehouse; the plaintiff was the maker of the whisky; had owned it prior to the passage of the act; and had, since June 30, 1919, paid the revenue tax on part of it. In the New York case the liquors were in general and special bonded warehouses; the plaintiffs were jobbers; and it does not appear when they became the owners of the liquors. Both cases come here by direct appeal under § 238 of the Judicial Code, were argued on the same day, and may be disposed of together. Four contentions are made in support of the relief prayed for: (1) that the act was void when enacted because it violated the Fifth Amendment; (2) that it became void before these suits were brought by reason of the passing of the war emergency; (3) that it was abrogated or repealed by the Eighteenth Amendment; (4) that by its own terms it expired before the commencement of these suits. These contentions will be considered in their order.

*First:* Is the act void because it takes private property

for public purposes without compensation in violation of the Fifth Amendment? The contention is this: The Constitution did not confer police power upon Congress. Its power to regulate the liquor traffic must therefore be sought for in the implied war powers; that is, the power "to make all laws which shall be necessary and proper for carrying into execution" the war powers expressly granted. Article I, § 8, clause 18. Congress might under this implied power temporarily regulate the sale of liquor and, if reasonably necessary, forbid its sale in order to guard and promote the efficiency of the men composing the army and the navy and of the workers engaged in supplying them with arms, munitions, transportation and supplies. *McKinley* v. *United States,* 249 U. S. 397, 399. But the exercise of the war powers is (except in respect to property destroyed by military operations, *United States* v. *Pacific Railroad,* 120 U. S. 227, 239) subject to the Fifth Amendment. *United States* v. *Russell,* 13 Wall. 623, 627. The severe restriction imposed by the act upon the disposition of liquors amounts to a taking of property; and being uncompensated would, at least as applied to liquors acquired before the passage of the act, exceed even the restriction held to be admissible under the broad police powers possessed by the States. Therefore, since it fails to make provision for compensation, which in every other instance Congress made when authorizing the taking or use of property for war purposes,[1] it is void. Such is the argument of the plaintiffs below.

---

[1] War Acts authorizing the seizure or requisition of property: March 4, 1917, c. 180, 39 Stat. 1168, 1193, July 1, 1918, c. 113, 40 Stat. 634, 651, factories, ships, and war materials; June 15, 1917, c. 29, 40 Stat. 182, 183, April 22, 1918, c. 62, 40 Stat. 535, November 4, 1918, c. 201, 40 Stat. 1020, street railroads, equipment, etc., and the acquisition of title to lands, plants, etc.; August 10, 1917, c. 53, 40 Stat. 276, 279 (Food Control Act), foods, fuels, factories, packing

That the United States lacks the police power, and that this was reserved to the States by the Tenth Amendment, is true. But it is none the less true that when the United States exerts any of the powers conferred upon it by the Constitution, no valid objection can be based upon the fact that such exercise may be attended by the same incidents which attend the exercise by a State of its police power, or that it may tend to accomplish a similar purpose. *Lottery Case,* 188 U. S. 321, 357; *McCray* v. *United States,* 195 U. S. 27; *Hipolite Egg Co.* v. *United States,* 220 U. S. 45, 58; *Hoke* v. *United States,* 227 U. S. 308, 323; *Seven Cases* v. *United States,* 239 U. S. 510, 515; *United States* v. *Doremus,* 249 U. S. 86, 93–94. The war power of the United States, like its other powers and like the police power of the States, is subject to applicable constitutional limitations (*Ex parte Milligan,* 4 Wall. 2, 121–127; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505, 571; *McCray* v. *United States,* 195 U. S. 27, 61; *United States* v. *Cress,* 243 U. S. 316, 326); but the Fifth Amendment imposes in this respect no greater limitation upon the national power than does the Fourteenth Amendment upon state power. *In re Kemmler,* 136 U. S. 436, 448; *Carroll* v. *Greenwich Ins. Co.,* 199 U. S. 401, 410. If the nature and conditions of a restric-

houses, coal mines, coal supplies, etc.; March 21, 1918, c. 25, 40 Stat. 451, railroads; May 16, 1918, c. 74, 40 Stat. 550, 551, June 4, 1918, c. 92, 40 Stat. 594, houses, buildings, properties, etc., in District of Columbia; July 18, 1918, c. 157, 40 Stat. 913, 915, ships; July 16, 1918, c. 154, 40 Stat. 904, telephone and telegraph systems; October 5, 1918, c. 181, 40 Stat. 1009, 1010, mines, mineral lands, etc.

See also Act of June 3, 1916, c. 134 (39 Stat. 166, 213), for the mobilization of industries, which authorizes the seizure of munition plants and provides that the compensation therefor shall be "fair and just," and the Act of March 4, 1917, c. 180, 39 Stat. 1168, 1169, authorizing the acquisition of aëroplane patents by condemnation, for which $1,000,000 was appropriated.

tion upon the use or disposition of property is such that a State could, under the police power, impose it consistently with the Fourteenth Amendment without making compensation, then the United States may for a permitted purpose impose a like restriction consistently with the Fifth Amendment without making compensation; for prohibition of the liquor traffic is conceded to be an appropriate means of increasing our war efficiency.

There was no appropriation of the liquor for public purposes. The War-Time Prohibition Act fixed a period of seven months and nine days from its passage during which liquors could be disposed of free from any restriction imposed by the Federal Government. Thereafter, until the end of the war and the termination of demobilization, it permits an unrestricted sale for export and, within the United States, sales for other than beverage purposes. The uncompensated restriction upon the disposition of liquors imposed by this act is of a nature far less severe than the restrictions upon the use of property acquired before the enactment of the prohibitory law which were held to be permissible in cases arising under the Fourteenth Amendment. *Mugler* v. *Kansas*, 123 U. S. 623, 668; *Kidd* v. *Pearson*, 128 U. S. 1, 23. The question whether an absolute prohibition of sale could be applied by a State to liquor acquired before the enactment of the prohibitory law has been raised by this court but not answered, because unnecessary to a decision. *Bartemeyer* v. *Iowa*, 18 Wall. 129, 133; *Beer Co.* v. *Massachusetts*, 97 U. S. 25, 32–33; *Eberle* v. *Michigan*, 232 U. S. 700, 706; *Barbour* v. *Georgia*, 249 U. S. 454, 459. See, however, *Mugler* v. *Kansas*, *supra*, pp. 623, 625, 657. But no reason appears why a state statute, which postpones its effective date long enough to enable those engaged in the business to dispose of stocks on hand at the date of its enactment, should be obnoxious to the Fourteenth Amendment; or why such a federal law should be ob-

noxious to the Fifth Amendment. We cannot say that
seven months and nine days was not a reasonable time
within which to dispose of all liquors in bonded ware-
houses on November 21, 1918. The amount then in
storage was materially less than was usually carried; [1]
because no such liquor could be lawfully made in America
under the Lever Food and Fuel Control Act (August 10,
1917, c. 53, § 15, 40 Stat. 276, 282) after September 9,
1917. And if, as is suggested, the liquors remaining
in bond November 21, 1918, were not yet sufficiently
ripened or aged to permit them to be advantageously
disposed of within the limited period of seven months
and nine days thereafter, the resulting inconvenience
to the owner, attributable to the inherent qualities of
the property itself, cannot be regarded as a taking of
property in the constitutional sense. *Clark Distilling
Co.* v. *Western Maryland Ry. Co.*, 242 U. S. 311, 332.

*Second:* Did the act become void by the passing of the
war emergency before the commencement of these suits?
It is conceded that the mere cessation of hostilities under
the armistice did not abridge or suspend the power of
Congress to resort to prohibition of the liquor traffic

---

[1] The amount of distilled spirits of all kinds in bonded ware-
houses June 30, 1919, was 72,358,151.1 gallons as compared with
282,036,460.2, June 30, 1914; 253,668,341.3 gallons, June 30, 1915;
232,402,878.3 gallons, June 30, 1916; 194,832,682.6 gallons, June 30,
1917; 158,959,264.5 gallons, June 30, 1918. Report of the Commis-
sioner of Internal Revenue for 1919, p. 173. The following explana-
tion is given by the Commissioner, p. 51, why more was not with-
drawn: "The high rates of tax on spirits, fermented liquors and wines
which were provided in the bill subsequently enacted into law as the
Revenue Act of 1918, prompted many dealers to make heavy purchases
of these commodities prior to the passage of the Act and, as a conse-
quence of this action on the part of the dealers as well as of the expan-
sion of prohibition territory throughout the United States the with
drawals from bonded warehouses materially declined after the passage
of the Act."

as a means of increasing our war efficiency; that the
support and care of the army and navy during demobiliza-
tion was within the war emergency; and that, hence,
the act was valid when passed. The contention is that
between the date of its enactment and the commencement
of these suits it had become evident that hostilities would
not be resumed; that demobilization had been effected;
that thereby the war emergency was removed; and that
when the emergency ceased the statute became void.

To establish that the emergency has passed, state-
ments and acts of the President and of other executive
officers are adduced; some of them antedating the enact-
ment of the statute here in question. There are state-
ments of the President to the effect that the war has
ended [1] and peace has come; [2] that certain war agencies
and activities should be discontinued; [3] that our enemies
are impotent to renew hostilities [4] and that the objects
of the act here in question have been satisfied in the
demobilization of the army and navy. [5] It is shown that
many war-time activities have been suspended; that
vast quantities of war materials have been disposed of;
that trade with Germany has been resumed; and that
the censorship of postal, telegraphic and wire communi-
cations has been removed. [6] But we have also the fact
that since these statements were made and these acts

[1] Address to Congress, Official U. S. Bulletin, Nov. 11, 1918, p. 5.

[2] Thanksgiving Proclamation, Official U. S. Bulletin, Nov. 18, 1918,
p. 1.

[3] Address to Congress, Dec. 2, 1918, Official U. S. Bulletin, Dec. 2,
1918, p. 6.

[4] Armistice Commemoration Proclamation, Nov. 11, 1919.

[5] Veto Message, October 27, 1919, Congressional Record, Oct. 27,
1919, p. 8063.

[6] U. S. Official Bulletin, Nov. 12, 1918, p. 3; Nov. 22, 1918, p. 1;
Nov. 27, 1918, p. 7; Dec. 12, 1918, p. 4; Dec. 20, 1918, p. 4; Dec. 30,
1918, p. 7; United States Bulletin, Feb. 27, 1919, p. 6; May 8, 1919;
May 12, 1919, p. 14; Oct. 20, 1919, p. 17.

were done, Congress, on October 28, 1919, passed over the President's veto the National Prohibition Act which, in making further provision for the administration of the War-Time Prohibition Act, treats the war as continuing and demobilization as incomplete; that the Senate, on November 19, 1919, refused to ratify the Treaty of Peace with Germany;[1] that under the provisions of the Lever Act the President resumed, on October 30, 1919, the control of the fuel supply which he had relinquished partly on January 31, 1919, and partly on February 20, 1919;[2] that he is still operating the railroads of which control had been taken as a war measure; and that on November 18, 1919, he vetoed Senate Bill 641, because it diminished that control;[3] that pursuant to the Act of March 4, 1919, c. 125, 40 Stat. 1348, he continues to control, by means of the Food Administration Grain Corporation, the supply of grain and wheat flour; that through the United States Sugar Equalization Board, Inc., he still regulates the price of sugar; that in his message to Congress on December 2, 1919, he urgently recommended the further extension for six months of the powers of the Food Administration; that as commander-in-chief he still keeps a part of the army in enemy occupied territory and another part in Siberia; and that he has refrained from issuing the proclamation declaring the termination of demobilization for which this act provides.

The present contention may be stated thus: That notwithstanding the act was a proper exercise of the war power of Congress at the date of its approval and contains its own period of limitation—"until the conclusion of the present war and thereafter until the termination of demob-

---

[1] Congressional Record, Nov. 19, 1919, p. 9321.

[2] United States Bulletin, Nov. 10, 1919, p. 9; U. S. Official Bulletin, Jan. 18, 1919, p. 1.

[3] Congressional Record, Nov. 19, 1919, p. 9323.

ilization,"—the progress of events since that time had produced so great a change of conditions and there now is so clearly a want of necessity for conserving the man power of the nation, for increased efficiency in the production of arms, munitions and supplies, that the prohibition of the sale of distilled spirits for beverage purposes can no longer be enforced, because it would be beyond the constitutional authority of Congress in the exercise of the war power to impose such a prohibition under present circumstances. Assuming that the implied power to enact such a prohibition must depend not upon the existence of a technical state of war, terminable only with the ratification of a treaty of peace or a proclamation of peace (*United States* v. *Anderson*, 9 Wall. 56, 70; *The Protector*, 12 Wall. 700, 702; *Hijo* v. *United States*, 194 U. S. 315, 323,) but upon some actual emergency or necessity arising out of the war or incident to it, still, as was said in *Stewart* v. *Kahn*, 11 Wall. 493, 507, "The power is not limited to victories in the field and the dispersion of the [insurgent] forces. It carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress."

No principle of our constitutional law is more firmly established than that this court may not, in passing upon the validity of a statute, enquire into the motives of Congress. *United States* v. *Des Moines Navigation Co.*, 142 U. S. 510, 544; *McCray* v. *United States*, 195 U. S. 27, 53–59; *Weber* v. *Freed*, 239 U. S. 325, 330; *Dakota Central Telephone Co.* v. *South Dakota*, 250 U. S. 163, 184. Nor may the court enquire into the wisdom of the legislation. *McCulloch* v. *Maryland*, 4 Wheat. 316, 421; *Gibbons* v. *Ogden*, 9 Wheat. 1, 197; *Brushaber* v. *Union Pacific R. R. Co.*, 240 U. S. 1, 25; *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 357. Nor may it pass upon the necessity for the exercise of a power possessed, since the possible abuse of a

power is not an argument against its existence. *Lottery Case*, 188 U. S. 321, 363.

That a statute valid when enacted may cease to have validity owing to a change of circumstances has been recognized, with respect to state laws, in several rate cases. *Minnesota Rate Cases*, 230 U. S. 352, 473; *Missouri Rate Cases*, 230 U. S. 474, 508; *Lincoln Gas Co.* v. *Lincoln,* 250 U. S. 256, 268. That the doctrine is applicable to acts of Congress was conceded *arguendo* in *Perrin* v. *United States*, 232 U. S. 478, 486; and *Johnson* v. *Gearlds*, 234 U. S. 422, 446. In each of these cases Congress had prohibited the introduction of liquor into lands inhabited by Indians, without specified limit of time; in one case the prohibition was in terms perpetual; in the other it was to continue "until otherwise provided by Congress." In both cases it was contended that the constitutional power of Congress over the subject-matter necessarily was limited to what was reasonably essential to the protection of the Indians. In the *Perrin Case* it was contended (p. 482) that the power was transcended because the prohibition embraced territory greatly in excess of what the situation reasonably required, and because its operation was not confined to a designated period reasonable in duration but apparently was intended to be perpetual. In *Johnson* v. *Gearlds* the contention was (p. 442) that a prohibition originally valid had become obsolete by reason of changes in the character of the territory included in it and the status of the Indians therein. In both cases the court, while assuming that since the power to impose a prohibition of this character was incident to the presence of the Indians and their status as wards of the Government and did not extend beyond what was reasonably essential to their protection, it followed that a prohibition valid in the beginning would become inoperative when in regular course the Indians affected were completely emancipated from federal guardianship and con-

trol, nevertheless held that the courts would not be justified in declaring that the restriction either was originally invalid or had become obsolete if any considerable number of Indians remained wards of the Government within the prohibited territory. In each case the decision rested upon the ground that the question what was reasonably essential to the protection of the Indians was one primarily for the consideration of the law-making body; that Congress was invested with a wide discretion; and that its action, unless purely arbitrary, must be accepted and given full effect by the courts.

Conceding, then, for the purposes of the present case, that the question of the continued validity of the war prohibition act under the changed circumstances depends upon whether it appears that there is no longer any necessity for the prohibition of the sale of distilled spirits for beverage purposes, it remains to be said that on obvious grounds every reasonable intendment must be made in favor of its continuing validity, the prescribed period of limitation not having arrived; that to Congress in the exercise of its powers, not least the war power upon which the very life of the nation depends, a wide latitude of discretion must be accorded; and that it would require a clear case to justify a court in declaring that such an act, passed for such a purpose, had ceased to have force because the power of Congress no longer continued. In view of facts of public knowledge, some of which have been referred to, that the treaty of peace has not yet been concluded, that the railways are still under national control by virtue of the war powers, that other war activities have not been brought to a close, and that it can not even be said that the man power of the nation has been restored to a peace footing, we are unable to conclude that the act has ceased to be valid.

*Third:* Was the act repealed by the adoption of the Eighteenth Amendment? By the express terms of the

Amendment the prohibition thereby imposed becomes effective after one year from its ratification. Ratification was proclaimed on January 29, 1919, 40 Stat. 1941. The contention is that, as the Amendment became on its adoption an integral part of the Constitution, its implications are as binding as its language; that in postponing the effective date of the prohibition the Amendment impliedly guaranteed to manufacturers and dealers in intoxicating liquors a year of grace; and that not only was Congress prohibited thereby from enacting meanwhile new prohibitory legislation, but also that the then existing restriction imposed by the War-Time Prohibition Act was removed. See *Narragansett Brewing Co.* v. *Baker and O'Shaunessy*, U. S. D. Ct. R. I., November 12, 1919.

The Eighteenth Amendment with its implications, if any, is binding not only in times of peace, but in war. If there be found by implication a denial to Congress of the right to forbid before its effective date any prohibition of the liquor traffic, that denial must have been operative immediately upon the adoption of the Amendment, although at that time demobilization of the army and the navy was far from complete. If the Amendment effected such a denial of power then it would have done so equally had hostilities continued flagrant or been renewed. Furthermore, the Amendment is binding alike upon the United States and the individual States. If it guarantees a year of immunity from interference by the Federal Government with the liquor traffic, even to the extent of abrogating restrictions existing at the time of its adoption, it is difficult to see why the guaranty does not extend also to immunity from interference by the individual States, with like results also as to then existing state legislation. The contention is clearly unsound.

*Fourth:* Did the prohibition imposed by the act expire by limitation before the commencement of these suits? The period therein prescribed is "until the conclusion of

the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States." It is contended both that the war has been concluded and that the demobilization has terminated.

In the absence of specific provisions to the contrary the period of war has been held to extend to the ratification of the treaty of peace or the proclamation of peace. *Hijo* v. *United States,* 194 U. S. 315, 323; *The Protector,* 12 Wall. 700, 702; *United States* v. *Anderson,* 9 Wall. 56, 70. From the fact that other statutes concerning war activities contain each a specific provision for determining when it shall cease to be operative,[1] and from the alleged absence of

---

[1] The provisions fixing the date of expiration of the several war acts are as follows:

(Aircraft Act being c. XVI, of the Army Appropriation Act of July 9, 1918, c. 143, 40 Stat. 889.) "Within one year from the signing of a treaty of peace with the Imperial German Government."

(Departmental Reorganization Act of May 20, 1918, c. 78, 40 Stat. 556.) "That this Act shall remain in force during the continuance of the present war and for six months after the termination of the war by the proclamation of the treaty of peace."

(Emergency Shipping Fund Act of June 15, 1917, c. 29, 40 Stat. 182, as amended by the Act of April 22, 1918, c. 62, 40 Stat. 535, and by the Act of November 4, 1918, c. 201, 40 Stat. 1020.) "All authority . . . shall cease six months after a final treaty of peace is proclaimed between this Government and the German Empire."

(Charter Rate and Requisition Act of July 18, 1918, c. 157, 40 Stat. 913.) "All power and authority . . . shall cease upon the proclamation of the final treaty of peace between the United States and the Imperial German Government."

(Railroad Control Act of March 21, 1918, c. 25, 40 Stat. 451, 458.) ". . . Federal control . . . shall continue for and during the period of the war and for a reasonable time thereafter, which shall not exceed one year and nine months next following the date of the proclamation by the President of the exchange of ratifications of the treaty of peace."

(Food Control Act of August 10, 1917, c. 53, 40 Stat. 276, 283.) "Sec. 24. That the provisions of this Act shall cease to be in effect

such a provision here, it is argued that the term "con-
clusion of the war" should not be given its ordinary legal
meaning; that instead it should be construed as the time
when actual hostilities ceased; or when the treaty of peace
was signed at Versailles, on June 28, 1919, by the Ameri-
can and German representatives; or, more generally, when
the actual war emergencies ceased by reason of our com-
plete victory and the disarmament of the enemy coupled
with the demobilization of our army and the closing of war
activities; or when the declared purpose of the act of
"conserving the man power of the Nation, and to increase

when the existing state of war between the United States and Germany
shall have terminated, and the fact and date of such termination shall
be ascertained and proclaimed by the President."

(Trading with the Enemy Act of October 6, 1917, c. 106, 40 Stat.
411, 412.) "The words 'end of the war' as used herein, shall
be deemed to mean the date of proclamation of exchange of ratifica-
tions of the treaty of peace, unless the President shall, by proclamation,
declare a prior date, in which case the date so proclaimed shall be
deemed to be the 'end of the war' within the meaning of this Act."

(Soldiers' and Sailors' Civil Relief Act of March 8, 1918, c. 20, 40
Stat. 440, at 441 and 449.) "(5) The term 'termination of the war'
as used in this Act shall mean the termination of the present war by
the treaty of peace as proclaimed by the President. . . .   Sec. 603.
That this Act shall remain in force until the termination of the war, and
for six months thereafter."

(Saulsbury Resolution of May 31, 1918, c. 90, 40 Stat. 593.) "That
until a treaty of peace shall have been definitely concluded between the
United States and the Imperial German Government, unless in the
meantime otherwise provided by Congress . . ."

(Wheat Price Guarantee Act of March 4, 1919, c. 125, § 11, 40 Stat.
1348, 1353.) "That the provisions of this Act shall cease to be in
effect whenever the President shall find that the emergency growing out
of the war with Germany has passed and that the further execution
of the provisions of this Act is no longer necessary for its purposes,
the date of which termination shall be ascertained and proclaimed by
the President; but the date when this Act shall cease to be in effect
shall not be later than the first day of June, nineteen hundred and
twenty."

efficiency in the production of arms, munitions, ships, food, and clothing for the Army and Navy" shall have been fully satisfied.  But there is nothing in the words used to justify such a construction.  "Conclusion of the war" clearly did not mean cessation of hostilities; because the act was approved ten days after hostilities had ceased upon the signing of the armistice.  Nor may we assume that Congress intended by the phrase to designate the date when the treaty of peace should be signed at Versailles or elsewhere by German and American representatives, since by the Constitution a treaty is only a proposal until approved by the Senate.  Furthermore, to construe "conclusion of the war" as meaning the actual termination of war activities, would leave wholly uncertain the date when the act would cease to be operative; whereas Congress evinced here, as in other war statutes, a clear purpose that the date of expiration should be definitely fixed.  The reason why this was not directed to be done by a proclamation of peace is made clear by the use of the word "thereafter."  It was expected that the "conclusion of the war" would precede the termination of demobilization.  Congress, therefore, provided that the time when the act ceased to be operative should be fixed by the President's ascertaining and proclaiming the date when demobilization had terminated.

.It is insisted that he has done so.  The contention does violence to both the language and the evident purpose of the provision.  The "date of which shall be determined and proclaimed by the President" is a phrase so definite as to leave no room for construction.  This requirement cannot be satisfied by passing references in messages to Congress, nor by newspaper interviews with high officers of the army or with officials of the War Department.  When the President mentioned in his veto message the "demobilization of the army and navy" the words were doubtless used in a popular sense,

just as he had declared to Congress, on the occasion of the signing of the armistice: "The war thus comes to an end." If he had believed on October 28, 1919, that demobilization had, in an exact sense, terminated, he would doubtless have issued then a proclamation to that effect; for he had manifested a strong conviction that restriction upon the sale of liquor should end. Only by such proclamation could the purpose of Congress be attained; and the serious consequences attending uncertainty be obviated. But in fact demobilization had not terminated at the time of the veto of the Act of October 28, 1919; or at the time these suits were begun; and, for aught that appears, it has not yet terminated. The Report of the Secretary of War made to the President under date of November 11, 1919 (and transmitted to Congress on December 1), in describing the progress of demobilization, shows (p. 17) that during the preceding ten days (November 1-10) 2,018 officers and 10,266 enlisted men had been discharged; the rate of discharge being substantially the same as during the month of October—in which 8,690 officers and 33,000 enlisted men were discharged.

The War-Time Prohibition Act being thus valid and still in force, the decree in Number 589 is reversed and the case is remanded to the District Court with directions to dismiss the bill; and the decree in Number 602 is affirmed.

No. 589.  *Reversed.*
No. 602.  *Affirmed.*