**THE ELQUI (ex SELMA) et al.**

**No. 17621.**

District Court, E. D. New York.

Sept. 26, 1945.

Covington, Burling, Rublee, Acheson & Shorb, of Washington, D. C., and Stanley W. Schaefer, of New York City (Stanley W. Schaefer, of New York City, Spencer Gordon, John G. Laytin, and Donald Hiss, all of Washington, D. C., and Maurice J. Smith, of New York City, of counsel), for libellant.

Kirlin, Campbell, Hickox & Keating, of New York City (Roger Siddall, of New York City, and David P. Dawson, of Brooklyn, N. Y., of counsel), for claimant-respondent.

MOSCOWITZ, District Judge.

The Court has conducted a trial upon a libel for possession under which the Steamship Elqui (ex Selma) was arrested while unloading in Brooklyn, within the jurisdiction of this court. By consent of the parties, the Court reserved decision on an application made to it to exercise its discretion to decline jurisdiction on the ground that the character of the parties and the subject matter involved make another forum proper.

Prior to the invasion of Denmark on April 9, 1940, the steamship Selma (now Elqui) was owned by libellant's predecessor, a Danish corporation. Upon the invasion, all merchant ships flying the Danish flag

received official instructions to take refuge in neutral ports pending an agreement with the Allied authorities which would prevent such ships from being used for the benefit of the Axis. Lying idle in Chilean waters, on May 8, 1941 the Selma was requisitioned by the Republic of Chile pursuant to an official decree issued by the Minister of Foreign Relations and Commerce. This decree, which incorporated by reference the provisions of a similar previous document, provided as follows:

"Considering the premises:

"That due to the fact that tonnage has been considerably reduced in marine traffic from Chile to foreign countries with a consequent disturbance to the national economy;

"That the situation is due immediately and directly to the war taking place in Europe, and in which Chile has declared herself neutral;

"That the tonnage of the National Merchant Marine and that given by other neutral nations does not compensate this lack;

"That since it is impossible to determine the length of this conflict, it is the duty of the Government to seek means whereby trade will remain uninterrupted, indispensable for national welfare;

"That the only possible means whereby satisfaction can be given this urgent necessity is to avail ourselves of the tonnage lying idle of the foreign merchant ships which have taken refuge in the ports of this Republic for several months;

"That the Government has agreed upon this measure in order to ensure the welfare of the Republic and to carry on commercial interchange with other neutral nations;

"That this measure, urgent, temporary and eventual, will in no way damage the legitimate owners of said vessels, and will not entail any forced obligations to the personnel on board because the intentions of the Government of Chile are to adjust, opportunely and directly with each of the legitimate shipowners or representatives, indemnization for usage and provision for maintenance of the personnel referred to, who will enjoy, for as long as they care to remain in Chile, the same treatment accorded the subjects of free nations resident in neutral territory.

"Decree:

"1) Be it declared of public utility for the duration of the present war, the following Danish merchant vessels anchored in the port of Talcahuano: FRIDA, LOTTA and HELGA.

"2) The above mentioned vessels are subject as from this date to the regulations contained in our merchant marine, insofar as they are applicable and will sail with the national flag."

It appears to be the position of the libellant that the decree under which the Chilean government became entitled to the use of the Selma was limited to "the duration of the present European war" and that since in libellant's view the war in Europe has terminated and is no longer in duration, the Danish corporation is entitled to possession of the ship. It is not necessary for this Court to determine whether the Chilean government acquired the use or the title to the ship under its decree, as only the question of the right to possession is involved in this proceeding. The Steamship Elqui is now registered in the Chilean National Merchant Marine and the certificate is that it is under the "tuicion" (i. e. guardianship or protection) of the Republic of Chile and is operated by claimant-respondent (known as the Chilean line), sailing regularly in common carrier service between Chile and the United States for the past four years.

Claimant-respondent's motion for this Court to exercise its discretion to decline jurisdiction is urged upon the ground that the parties are foreign nationals contesting the right to possession of a foreign ship, which right depends upon the construction of a foreign decree. Ever since The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152, the right of the District Court to decline to act where justice would be as well done by remitting the parties to their home forum has been clear. But in most of the cases cited by claimant-respondent (Canada Malting Co. v. Paterson Steamships Co., 285 U.S. 413, 52 S.Ct. 413, 76 L. Ed. 837; Charter Shipping Co. v. Bowring, Jones & Tidy, 281 U.S. 515, 50 S.Ct. 400, 74 L.Ed. 1008; The Kotkas, D.C.E.D.N.Y. 1941, 37 F.Supp. 835), both parties were from the same foreign country or there was a complicated question of foreign law involved. Here neither circumstance is present. The libellant is a Danish corporation while the claimant-respondent is a Chilean corporation operating under the Chilean government. The parties have stated to the Court that no question of sovereign immunity is raised at this time

and that it is not necessary for this Court to determine whether the Chilean government acquired title to the ship or merely requisitioned its use. Nor has either party introduced any Chilean law under which the term "for the duration of the present European war", as used in the decree, has any peculiar significance. Under such circumstances, it would be unusual for a court to decline jurisdiction, having the res within its province.

In discussing the subject of foreign litigants, the Supreme Court in The Belgenland, supra, 114 U.S. at page 368, 5 S.Ct. at page 866, 29 L.Ed. 152, made the following observations:

" * * * Indeed, where the parties are not only foreigners, but belong to different nations, and the injury or salvage service takes place on the high seas, there seems to be no good reason why the party injured, or doing the service, should ever be denied justice in our courts. Neither party has any peculiar claim to be judged by the municipal law of his own country, since the case is pre-eminently one communis juris, and can generally be more impartially and satisfactorily adjudicated by the court of a third nation having jurisdiction of the res or parties, than it could be by the courts of either of the nations to which the litigants belong. As Judge Deady very justly said, in a case before him in the district of Oregon: 'The parties cannot be remitted to a home forum, for, being subjects of different governments, there is no such tribunal. The forum which is common to them both by the jus gentium is any court of admiralty within the reach of whose process they may both be found.' Bernhard v. Creene [Fed.Cas.No.1,349], 3 Sawy. 230, 235."

And in The Mandu, 2 Cir., 102 F.2d 459, 462, decided by Judge Patterson in this circuit, it was said:

"So for jurisdictional purposes the case may be treated as one where the adversaries were German shippers on the one side and a Brazilian ship owner on the other. On such a basis the foreigners interested were of different nationalities; they had no common home to which they might be sent to try their case; no agreement had been made that litigation be carried on in a particular country. Under these conditions it would have been unusual to have declined jurisdiction even at an early stage."

The application for the Court to exercise its discretion to decline jurisdiction is therefore denied.

On the merits, the validity of the possession of the Chilean government under its decree as it existed prior to V-E Day is not challenged. The only question presented is whether the decree provides automatic termination to that lawful possession and whether such termination has materialized. Neither side has aided the Court in determining what the Chilean government intended by the use in this decree of the words "for the duration of the present European war." Libellant has offered newspaper clippings reporting the remarks of prominent Chilean officials applauding the end of the war but it is obvious that such pronouncements are in no way binding upon the government of Chile and its official view on the determination of the European war. Various persons in the United States, from President Truman down, have spoken of the end of the war but there is no doubt that officially the war is not at an end in the United States.*

Rendering his opinion in a letter to President Truman dated September 1, 1945, Attorney General Tom C. Clark stated:

"First of all, it should be borne in mind that the war powers of the President and the Congress do not automatically cease upon the termination of actual fighting. As the Supreme Court said in Stewart v. Kahn, 11 Wall. 493, at [page] 507 [20 L. Ed. 176]: '(The war power) * * * is not limited to victories in the field and the dispersion of the insurgent forces. It carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress.' See also Hamilton v. Kentucky Distilleries Co., 251 U.S. 146 [40 S.Ct. 106, 64 L.Ed. 194].

"The broad basis of governmental power on which the various emergency and wartime statutes rest cannot, therefore, be said to have been terminated by recent developments, including the unconditional surrender of our enemies. Questions do arise at the present stage, however, with regard to the time which the Congress has

---

* President Truman, in his message to the Congress of September 6, 1945, in dealing with the war stated among other things: "The end of the war came more swiftly than most of us anticipated." (See page 16, New York Times, Friday, September 7, 1945.)

specified in individual statutes as being the termination date of the powers therein conferred. As will appear in the attached compilation, certain of the wartime statutes are made effective only 'in time of war,' or 'during the present war,' or 'for the duration of the war.' Still other expressions may be found of similar character.

"Speaking generally, I believe that statutes of the type just mentioned should be considered as effective until a formal state of peace has been restored, unless some earlier termination date is made effective by appropriate governmental action. In Hamilton v. Kentucky Distilleries Co., supra, Mr. Justice Brandeis, speaking for the Court, said: 'In the absence of specific provisions to the contrary, the period of war has been held to extend to the ratification of the treaty of peace or the proclamation of peace.' Again, in Commercial Cable Co. v. Burleson, [D.C.], 255 F. 99, 104, Judge Learned Hand rejected the contention that certain wartime powers conferred on the President in the First World War had terminated with the Armistice of November 11, 1918, and added: 'Even if I were to assume that the power were only coextensive with a state of war, a state of war still existed. It is the treaty which terminates the war.' See also Kahn v. Anderson, 255 U.S. 1, 10 [41 S.Ct. 224, 65 L.Ed. 469]; Ware v. Hylton, 3 Dall. 199, 236 [1 L.Ed. 568]; 1898, 22 Op.Atty. Gen. 190. It is perhaps unnecessary to add that the Congress can at any time, in response to changed conditions, repeal or amend any wartime statute or group of statutes."

 Here is not involved a contract between private parties in which it might be said that the term "for the duration of the present European war" was used in its ordinary or lay concept, referring to the cessation of actual hostilities. The language is employed in an official decree of a government, presumably drawn with all the consideration and formality ordinarily accorded such a document. In the absence of proof to the contrary, this Court must therefore assume that those who drafted this document had in mind the technical meaning of "for the duration of the present European war" which must be construed to mean the formal signing of a peace treaty or a proclamation by the sovereign that the war has been officially recognized as being at an end. Hamilton v. Kentucky

Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194; Stewart v. Kahn, 11 Wall. 493, 20 L.Ed. 176; Commercial Cable Co. v. Burleson, D.C., 255 F. 99.

In a note received by the Royal Danish Legation in Washington, D. C. from the Chilean Embassy, Washington, D. C., on September 11, 1945, it was stated in part: "The Ministry of Foreign Affairs of Chile has informed the Chilean Embassy in Washington that the Government of Chile is presently studying a proposal to be made to the Government of Denmark regarding delivery and compensation for the use of the vessels referred to. This study is progressing rapidly and the Government of Chile will be able in the very near future to submit to the Government of Denmark a formula which, it is felt, will solve this matter in a friendly manner." It thus appears that arrangements are under way for the voluntary return of the vessel here involved to its Danish owners but this Court will not direct such return under its interpretation of the rights of the parties.

The libel is dismissed.