MONTANA CONTRACTORS' ASSOCIATION, a Montana non-profit Corporation, and Lloyd C. Lockrem, Inc., a Montana Corporation, Plaintiffs,

and

Donna Higgins, d/b/a Higgins & Co., Intervenor,

v.

The SECRETARY OF COMMERCE OF the UNITED STATES, the Montana State District Officer of the Montana Economic Development Administration, and the City of Kalispell, Defendants.

No. CV 77–62–M.

United States District Court,
D. Montana,
Missoula Division.

Nov. 7, 1977.

Poore, McKensie, Roth, Robischon & Robinson, Butte, Mont., for plaintiffs and intervenor.

Gerald Hartman, Dept. of Justice Employment Security Civ. Rights Div. Washington, D. C., for Secretary of Commerce.

Murray, Donahue & Kaufman, Kalispell, Mont., for the City of Kalispell.

## OPINION

RUSSELL E. SMITH, Chief Judge.

The Montana Contractors' Association and one of its members, Lloyd C. Lockrem, Inc., a contractor, bring this action for injunctive relief. Donna Higgins, a woman and the sole proprietor of Higgins & Co., has intervened on behalf of the plaintiffs. The case is now before the court on an application for a preliminary injunction.

The Public Works Employment Act of 1977 (Pub.L.95–28, 91 Stat. 116) became law on May 13, 1977. It amended the Local Public Works Capital Development and Investment Act of 1976, 42 U.S.C. §§ 6701–35. The 1977 Act appropriated an additional $4,000,000,000 for public works projects. Section 103(f)(2) of the Act provides:

> Except to the extent that the Secretary determines otherwise, no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term "minority business enterprise" means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.

The purposes of the 1976 Act were stated to be: (1) to alleviate the problem of national unemployment; and (2) to stimulate the national economy by assisting state and local governments to build badly-needed public facilities. House Report No. 94–1077, 94th Cong., 2d Sess. at 2 (1976). The bill is designed to inject money immediately into the economy, and to that end Congress

required that the Secretary act on each application for a grant within 60 days after receipt of the application. On failure to do so, the application is automatically deemed approved. 42 U.S.C. § 6706. The Act also provides that the grantee be required to assure the Secretary that on-site labor could begin within 90 days of project approval. 42 U.S.C. § 6705(d).

The Economic Development Administration (EDA) approved a grant to the City of Kalispell for the purpose of construction of a storm sewer. The grant was conditioned on the compliance with the Minority Business Enterprise (MBE) requirements, and the City was advised that there could be no waiver of those requirements prior to the opening of the bids. Plaintiff Lockrem wanted to bid on the project but, after due diligence, was unable to find an MBE contractor to whom a subcontract might be let. He asked the EDA whether there could be a waiver of the requirement under the guidelines and was advised that only a grantee could request a waiver.

■ Plaintiffs claim that the requirement for MBE participation in the amount of 10% of each grant discriminates against nonminority enterprises on the basis of race alone and does for that reason deny to them the equal protection of the laws.[1] The Act does discriminate, and the discrimination is based on race alone. Plaintiff Lockrem did lose an opportunity to participate equally in bidding. Members of the plaintiff association have lost and will lose subcontracts because the MBE requirement will force prime contractors to grant subcontracts to MBE contractors even though their bids are higher than those made by nonminority contractors. Non-MBE contractors will be inconvenienced otherwise in bidding on these public works contracts because of the MBE requirements expressed in the Act and the guidelines.[2] The question which remains is: May the Congress, to accomplish what it deems to be a desirable social purpose, make discrimination based on race alone? I do not reach that question.

■ I deal here with an application for temporary injunctive relief, a form of relief equitable in nature, not afforded as a matter of right but addressed to the discretion of the court.

The award of an interlocutory injunction by courts of equity has never been

---

1. Equal protection concepts, while not explicitly stated in the fifth amendment, are, by reason of it, coexistent with the equal protection mandated as against the states by the 14th amendment. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *United States Dep't of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Schneider v. Rusk,* 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964).

2. By way of example the guidelines provide: "An MBE is qualified if it can perform the services or supply the materials that are needed. Grantees and prime contractors will be expected to use MBE's with less experience than available nonminority enterprises and should expect to provide technical assistance to MBE's as needed. Inability to obtain bonding will ordinarily not disqualify an MBE. Grantees and prime contractors are expected to help MBE's obtain bonding, to include MBE's in any overall bond or to waive bonding where feasible. The Small Business Administration (SBA) is prepared to provide a 90% guarantee for the bond of any MBE participating in an LPW project. Lack of working capital will not ordinarily disqualify an MBE. SBA is prepared to provide working capital assistance to any MBE participating in an LPW project. Grantees and prime contractors are expected to assist MBE's in obtaining working capital through SBA or otherwise."
and:
"Only the Grantee can request a waiver. Ordinarily a waiver request will be considered only after the Grantee and its prime contractors have taken every feasible action to achieve at least 10% MBE participation. For example, if the Grantee or its prime contractors have taken all feasible steps to locate relevant MBE's and have requested all available qualified MBE's to participate as contractors, subcontractors or suppliers and not enough MBE's can or will participate to reach the 10% MBE participation goal, a waiver request detailing the efforts of the Grantee and its prime contractor may be necessary in order for the project to proceed. Such a waiver request would ordinarily be made after the initial bidding or negotiation procedures proved unsuccessful."

regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff. Compare *Scripps-Howard Radio v. Federal Communications Comm'n,* 316 U.S. 4, 10, 62 S.Ct. 875, 86 L.Ed. 1229 and cases cited. Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction.

—*Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944). Where, as here, public interests are involved, the court has an even broader discretion.

But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff. *Virginian Ry. Co. v. United States,* 272 U.S. 658, 672–3, 47 S.Ct. 222, 71 L.Ed. 463; *Petroleum Exploration Co. v. Public Service Comm'n,* 304 U.S. 209, 222–3, 58 S.Ct. 834, 82 L.Ed. 1294; *Dryfoos v. Edwards,* 2 Cir., 284 F. 596, 603, affirmed, 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194; see *Beaumont, S. L. & W. Ry. Co. v. United States,* 282 U.S. 74, 91, 92, 51 S.Ct. 1, 75 L.Ed. 221. Compare *Wisconsin v. Illinois,* 278 U.S. 367, 418–21, 49 S.Ct. 163, 73 L.Ed. 426. This is but another application of the principle, declared in *Virginian Ry. Co. v. System Federation,* 300 U.S. 515, 552, 57 L.Ed. 592, 81 L.Ed. 789, that "Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." (Footnote omitted.)

—*Yakus v. United States,* 321 U.S. 414, 440–41, 64 S.Ct. 660, 675, 88 L.Ed.2d 834 (1944).

One factor to be considered in the balancing is the applicant's probability of ultimate success. 7 Moore's Federal Practice ¶ 65.04, at 65–39 (2d ed. 1975).

■ There is no doubt but that the plaintiffs lose something by reason of the MBE requirement. A generation ago, when Mr. Justice Harlan's oft-quoted statement "our Constitution is color-blind" was regarded as a verity, and when it was thought that individuals should, in law, be judged and treated as individuals without consideration of race or color, plaintiffs' chance to succeed in this case would have appeared quite certain. That certainty no longer exists. In *DeFunis v. Odegaard,* 82 Wash.2d 11, 507 P.2d 1169 (1973), with two judges dissenting, a form of inverse discrimination was approved in a controversy over law school admissions. Mr. Justice Douglas, in his dissent in *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), disagreed with the majority in the Washington case. In *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), the Supreme Court of California, with one judge dissenting, disapproved a form of inverse discrimination dealing with medical school admissions. The Supreme Court granted certiorari (429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535), indicating that at least four members of the Supreme Court recognized a substantial problem. The extent of controversy is indicated by Mr. Justice Brennan in his dissent in *DeFunis*: "Few constitutional questions in recent history have stirred as much debate . . . ."[3] What distinctions, if any, will ultimately be drawn between the admission problems in *DeFunis* and in *Bakke* and the MBE problem in this case, I do not know, but, until the Supreme Court speaks in *Bakke,* the likelihood of plaintiffs prevailing here cannot be forecast with any degree of certain-

---

**3.** The dissenting opinion in *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152, 1191 (1976), docu-ments the conflict in scholarly opinion. *See also Symposium: Bakke v. Board of Regents,* 17 Santa Clara L.Rev. 271–404 (1977).

ty. *See Constructors Association of Western Pennsylvania v. Kreps,* 441 F.Supp. 936 (W.D.Pa.1977), declaring the MBE requirement constitutional; and *Associated General Contractors of California v. Secretary of Commerce,* 441 F.Supp. 955 (C.D. Cal.1977), to the contrary. *See also Associated General Contractors of California v. San Francisco Unified School District,* 431 F.Supp. 854 (N.D.Cal.1977).

Assuming *arguendo* that plaintiffs' constitutional rights are violated by the MBE requirement, the extent of the damage which will be caused by infringement is not clear. If, as plaintiffs urge, there are very few MBE's in this trade area, the EDA may, as it has power to, waive the MBE requirements in many cases. If, however, it be assumed that the nonminority contractors will lose awards in the amount of 10% of the total of the Montana grants ($32,-928,144), and if it be assumed that there will be a profit factor of 10% on each project, then, in terms of profits, some unknown number of Montana contractors will lose profits in a total amount of $329,281.

As opposed to this, a restraining order will frustrate the congressional policy immediately to reduce unemployment. There is some evidence that the grants made in Montana will create from 3,711 to 4,012 person years of direct and indirect employment. Any delay in construction work will affect adversely an estimated 8,112 workers who would be directly employed. Whether or not these estimates are completely accurate, there is no doubt that a substantial number of construction workers will be adversely affected by an injunction.

Perhaps more important is the possible effect of a restraining order upon the entire program. In Montana grants totaling $32,-978,144 have been approved for 60 projects. The court could restrain the EDA from enforcing the MBE requirement, but if the Secretary were to take the position that the decision in *Constructors Association of Western Pennsylvania stated the law and that the MBE requirement is constitutional, could this court require that the EDA fund projects on which the bidders had not complied with a policy which the statute requires the Secretary to follow?*

The time within which on-site labor must begin is now running. Any injunctive relief would prevent many, if not all, of the grantees from meeting that deadline. What will happen if the deadlines cannot be met is wholly uncertain. Assurances of on-site construction starts within 90 days could not be given, and absent these assurances the Secretary, acting through EDA, might divert grants to those areas where the congressional policy could be carried out. In short, the issuance of a preliminary injunction would either stop the projects in Montana or force the EDA to proceed in a manner contrary to at least two specific statutory policy declarations. Plaintiffs suggest that the court has power to and should excise the MBE requirements, mandate the funding of the grants already approved, and extend the time deadlines to the extent that the temporary restraining order has interfered with the meeting of them. An assumption by this court of such powers would not be final—its exercise would remain subject to review, and in the meantime the entire program in the State of Montana could be shut down.

Balancing the equities, I am of the opinion that I should refrain from issuing a preliminary injunction.