Campbell, Chief Justice,
delivered the opinion of the court:
The plaintiff’s petition is demurred to, and the questions thus presented involve some features, particularly section 25, of the Lever Act, approved August 10, 1917, 40 Stat., 275. The claim is that under the Lever Act and the orders of the President and the Fuel Administrator fixing the prices of coal “ a contract was created between the claimant and the United States” by which the latter became obligated to pay “ a sum of money which added to the amount received by the plaintiff from sales of coal at the prices fixed by the Government ” during the period mentioned “ will be just compensation for the coal sold at the prices so fixed.”
The plaintiff had been engaged for many years in the business of mining, producing and selling anthracite coal *434 in tbe State of Pennsylvania. It was operating mines and collieries in Schuylkill County when the Lever Act was passed. The coal mined by it was of the white-ash grade, and its principal business consisted of the mining and handling the larger sizes of coal, designated as egg, stove, chestnut, and pea, which are commonly called “ domestic sizes.” As an incident to mining and producing domestic sizes, there is necessarily produced some smaller sizes of coal, designated as buckwheat, rice, barley, and culm, which are commonly called “ steam sizes.” These are “ sold and used for manufacturing purposes in competition with bituminous coal.” The averments of the petition are substantially as follows: That the President, “ under and by virtue of the powers granted to him by ” the Lever Act, by Executive order, on August 23,1911, fixed the maximum price at which the domestic sizes of anthracite coal could be sold f. o. b. mines after September 1, 1917; that on the 23d day of August, 1911, the President appointed Mr. Garfield the United States Fuel Administrator, to whom was delegated, by the President, the powers and authority given to the latter in the Lever Act, so far as it applied to fuel; that the maximum price fixed by the President in August for anthracite pea coal was reduced by the Fuel Administrator on October 1 by 60 cents per ton; that the prices on domestic sizes as originally fixed, and as amended in October, were afterwards increased by adding 35 cents per ton thereto; that these latter prices were again reduced by 30 cents per ton on all coal sold during the months of April, May, June, July, and August, 1918; that a further revision was made in November, 1918, by increasing the prices on domestic sizes by $1.05 per ton on coal mined and produced after November, 1918; that the maximum prices were fixed, as above stated, when the coal was mined or produced by certain designated persons or collieries, and that other, producers could charge 75 cents per ton more than those named. The plaintiff was not one of those specially named, but came within the latter class.
It is averred that the maximum prices, as originally fixed, or as amended or revised, and as applied to coal mined and produced by plaintiff, “ were unjust, unreasonable, and did *435 not afford just compensation therefor”; that these prices were unsatisfactory to plaintiff and were protested against by it from time to time to the Fuel Administrator.
A statement for each month, beginning September, 1917, and extending to, and including, January, 1919, is made, purporting to show the total number of tons of the different sizes of coal produced by plaintiff, the quantities sold at the maximum fixed prices, and the quantities of steam sizes sold at other than the prices fixed- for domestic sizes. Taking one of these monthly statements as typical of all it appears that the plaintiff produced and sold in January, 1918, approximately 20,580 tons of coal of domestic and steam sizes, of which there were of the four domestic sizes 15,515 tons, and of the steam sizes 5,065 tons. The amount realized from domestic sizes is stated, and the amount realized from other sizes is also stated. It is then averred that these domestic sizes were all sold “ either at the maximum prices ” fixed, and applicable to plaintiff’s product during the month, “or under contracts approved by the Fuel Administrator at prices higher than those so fixed,” while the steam sizes were sold at prevailing market prices, and that plaintiff’s total receipts from its mining operations during the month of January were $110,982.99.
It is alleged that “the cost of-production of the said coal, during the said month, including the expenses of operation, maintenance, depreciation, and depletion, was $104,799.83.” A similar averment is made as to the cost of production in each of the months mentioned, the amounts alone varying. There is an averment that a reasonable price for the 15,515 tons of coal of domestic sizes mined and sold at Government prices during January “ and the minimum price which this claimant could have obtained for the same if the prices had not been fixed ” would have been at least $9,250 in excess of receipts for coal sold at the fixed prices.
Recapitulating the statements for the several months, it is claimed (1) that plaintiff’s total receipts from all mining operations were, in round figures, $1,677,000, and its “cost of production” $1,678,000, or an actual loss, stated to be $838.25; (2) that if “ fair prices ” had been fixed, its minimum profits would have been $238,433,71; and (3) that its *436 loss, on account of price fixing, was the sum of these items, or $239,261.96. It is averred that a reasonable profit would have been 75 cents per ton.
The plaintiff contends that it is entitled to reasonable compensation for the coal it sold at prices fixed by the Government; that, under the provisions of the Lever Act, it was the intention of Congress that the Government should respond for the difference between the amounts realized at the fixed prices and the amount (at least the minimum amount) plaintiff would have realized from sales if the prices for coal had not been fixed, and that unless this contention be upheld, there would be very grave doubt of the constitutionality of the act. Under the construction thus contended for, it is said in its brief, there can be no doubt as to the constitutionality of the price-fixing provision.
Manifesly, if the Lever Act, or the provisions thereof relating to the fixing of prices, be unconstitutional, the plaintiff can take nothing by its suit, and this is true whether the unconstitutionality rested upon a want of authority in Congress to enact the legislation in question or upon the plaintiff’s contention that the severe penalties prescribed by the act amount to a prohibition against seeking judicial construction and therefore deny to plaintiff the equal protection of the law. Ex parte Young, 209 U. S., 123, 145.
1. Whether the act in its price-fixing provisions is constitutional or not depends on the power of Congress to enact it. 'Section 1 clearly shows the purposes of the statute and that it was a war measure. Not the least of the purposes mentioned was to establish and maintain Government control of foods, feed, and fuel, and other things, called in the act “necessaries.” It is declared that by reason of the existence of a state of war, it is essential to the national security and defense, for the successful prosecution of the war, and for the support of the Army and Navy, not alone to assure an adequate supply and equitable distribution of the “necessaries,” but to prevent scarcity, monopolization, manipulation, and private control, affecting the supply, distribution, and movement of the same.
*437 Among the powers conferred op the Congress by the Constitution are these:
“ To define and punish * * * offenses against the law of nations.
“To declare war * * * and make rules concerning captures on land and water.
“ To raise and support armies * * *.
“To provide and maintain a Navy.
“ To make rules for the government and regulation of the land and naval forces.
“To provide for calling forth the militia to execute the laws of the Union, suppress insurrection, and repel invasions.
“ To provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the States, respectively, the appointment of the officers, arid the authority of training the militia according to the discipline prescribed by Congress * * *.
“To make all laws which shall be hecessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the Government of the United States or in any department or officer thereof.”
These powers are granted by Article I, section 8.
In connection with these powers, expressly granted, there should be considered the provisions which prohibit the several States, without the consent of Congress, from keeping troops or ships of war in time of peace from entering into any agreement or compact with another State or with a foreign power or from engaging in war unless actually invaded or in such imminent danger as will not admit of delay (Art. I, sec. 10), and the further provision obligating the United States to protect each of the States against invasion (Art. IV, sec. 4).
The prohibition against the exercise of war powers by the States, except with the consent of Congress, may have an important bearing on the reservation to the States, respectively, or to the people, made in the tenth amendment. The powers that are reserved are those not delegated, to the United States by the Constitution “ nor prohibited by it to the States.” Under these grants and guaranties of the Con *438 stitution and its prohibitions against State action were the powers that inhered in the State as an independent sovereignty, by which its defense and protection could be asserted, entirely lost, or were they carried by implication into the agency, created by the Constitution, charged with the duty of defense and protection, namely, the United States?" As early as the year 1801 it was declared by Chief Justice Marshall that “the whole powers of war” were vested by the Constitution in Congress. The Amelia, 1, Cranch, 28.
The Nation was at war, and because of that fact Congress determined, among other things, that the prices at which producers and dealers could sell coal should be fixed and controlled by governmental agencies. It requires no argument to show that coal was a “ necessary.” Whether it was or not, or what we may think of the necessity for the legislation in question, is immaterial, however, because “ Congress is authorized to make all laws necessary and proper to carry into effect, the granted powers. The measures to be taken in carrying on war and to suppress insurrection are not defined. The decision of all such questions rests wholly in the discretion of those to whom the substantial powers involved are confided by the Constitution.” Stewart v. Kahn, 11 Wall., 493, 506. The courts may not inquire into the motives of Congress nor the wisdom of the legislation, nor may they pass upon the necessity of a power possessed. Hamilton v. Kentucky Distilleries Co., 251 U. S., 146. The war power of the United States, like its other powers, is subject to applicable constitutional limitations. Hamilton v. Kentucky Distilleries Co., supra. This is equivalent to saying that the Constitution is to be construed by all of its parts. But the general principle stated in McCulloch v. Maryland, 4 Wheat., 316, 421, has been uniformly conceded to be the true one in determining the validity of an enactment. The Chief Justice there stated:
“ We admit, as all must admit, that the powers of the Government are limited, and that its limits are not to be transcendéd. But we think the sound construction of the Constitution must allow to the National Legislature that discretion with respect to the means by which the powers it confers are to be carried into execution which will enable that body to perform the high duties assigned to it in the *439 manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited but consistent with the letter and spirit of the Constitution, are constitutional.”
The legislation is not to be measured by the grant of some special power, but by “ the scope of the Constitution ” itself, because Congress can make laws necessary and proper for carrying into execution the enumerated powers and “ all other powers vested by this Constitution in the Government of the United States.” Eelative to this latter provision, it was said, in United States v. Fisher, 2 Cranch, 358, 395—
“In construing this clause, it would be incorrect and would produce endless difficulties if the opinion should be maintained that no law was authorized which was not indispensably necessary to give effect to a specified power.”
As already suggested, there is prohibited to the States, severally, a very important attribute of sovereignty — the right to wage war — and the United States undertakes to defend and protect the State against invasion. And one of the principal purposes of the Constitution is declared, in its preamble, to be to provide for the common defense.
The power to effectuate these objects and guaranties is within the scope of the Constitution and resides, primarily, in the legislative department of the Government. Whatever is necessary to their accomplishment may be done by the Government, because it is not conceivable that the Constitution fails at the moment of extreme test of the Nation and people it was established to serve.
“ Congress has power to declare war and to create and equip armies and navies * * *. Having such powers, it has such other and implied ones as are necessary and appropriate for the purpose of carrying the powers expressly given into effect.” United States v. Gettysburg Ry., 160 U. S., 668, 681.
The extent of the war power may not be accurately defined. It would be unwise to attempt to say in advance what it may be, because, as has been said, “ war creates its own necessities,” and these must be met as they arise. It can, however, be confidently asserted, within the scope of *440 the Constitution, that the war power of the United States is at least coextensive with the Nation’s right of self-preservation. In view of these powers and the declared purposes of the legislation, we can not doubt the existence of the right to fix the prices of coal, as was authorized by the Lever Act, or the propriety of its exercise. This price-fixing feature was not a taking of property within the meaning of the fifth amendment. It in effect declared that certain products had become clothed by the necessities of war and the exigencies of the situation with a public interest. Provision is made for requisitioning the plant or business, as well as for purchasing the entire output. So long as the owner continued to operate he came within the terms of the law, but as was said in Munn v. Illinois, 94 U. S., 113, 126, “ He may withdraw his grant by discontinuing the use, but so long as he maintains the use he must submit to the control.”
The plaintiff insists, however, that the act itself creates a liability against the United States to pay the difference between the amount realized from sales of its coal at the prices fixed and the amounts it would have realized at proper market prices. This liability, it is argued, is found in the terms of the act or, at least, in the intention of Congress in enacting section 25 of the Lover Act.
The fourth paragraph of section 25 reads:
“ That if the prices so fixed, or if in the case of the taking over or requisitioning of the mines or business of any such producer or dealer, the compensation therefor, as determined by the provisions of this act, be not satisfactory to the person or persons entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined and shall be entitled to sue the United States to recover such further sum as, added to said seventy-five per centum, will make up such amount as will be just compensation in the manner provided by section twenty-four, paragraph twenty, and section one hundred and forty-five of the Judicial Code.”
Plainly this language is not sufficient (except by interpolating a phrase not to be found in the act) to create such a liability, as is asserted. The plaintiff would have us interpolate certain words or to interpret the paragraph as *441 though it read “ that if the prices so fixed * * * be not satisfactory to the person or persons entitled to receive the same, such persons * * * shall be entitled to sue the United States to recover such further sum as * * * will make up such amount as will be just compensation, etc.”
It is of prime importance to ascertain and give effect to the legislative intention, but that intention is to be sought primarily in the language of the enactment. The interpretation which plaintiff insists upon imposes a liability on the Government for the difference between the amount realized by producers of coal and coke for their products when disposed of at Government prices, and the amounts that would have been received from sales at prices determined by the producers or market conditions. In other words, that Cos-gress intended that the President could fix the maximum prices to be charged by producers of coal and coke when selling it to dealers or consumers, and that such producers could receive the purchase price from these and then recover from the United States the amounts, including a fair and just profit, which they would have received from dealers and consumers if permitted to dispose of their products in their own way. They would credit, however, the amount received from or chargeable to such dealers or consumers.
The act deals with a number of articles which are termed “ necessaries.” Why it would give a status to coal and coke so different from that given to other necessaries is not made clear by any consideration adduced in argument. The minimum price for wheat was fixed to stimulate production. If the only purpose as to coal was to stimulate its production, why was the maximum price, instead of the minimum, prescribed as to that one of the necessaries? The applicable purpose declared in the act was to “ establish and maintain Government control of such necessaries during the war,” as well as to prevent, locally or generally, scarcity, monopolization, hoarding, and injurious speculation.
Accordingly, section 25 as finally framed makes provision for several contingencies affecting the coal and coke supply.
1. It authorizes the fixing of maximum prices at which these products could be sold.
*442 v 2. It authorizes the requisitioning and taking over of the plant, business, and all appurtenances thereof, belonging to the producer or dealer, and the operation thereof through governmental agency.
■S. It authorizes the President to require any and all producers of coal and coke to sell their entire products only to the United States.
There is an express provision for just compensation to producer or dealer, for the use of the plant, business, etc., that may be taken over, and there are provisions relating to the prices to be paid for the products when required to be sold to the United States alone, and then follows a provision that if the prices so fixed by the “ Federal Trade Commission” be unsatisfactory to the producer, he could accept 75 per cent of the amount so determined and recover from the United States such further sum as, added to the 75 per cent, will make such amount as will be “just compensation.” The “ prices ” here referred to, it will be observed, are those to be fixed by the Federal Trade Commission. The fact, however, is that the President did not adopt the Federal Trade Commission as the agency for fixing the price, nor was he required by the act to do so. He proceeded under other provisions of the act. And while there is provision as to the prices, fixed by the Federal Trade Commission, in the case of taking the entire product by the United States, where can be found any provision relating to the prices to be paid for the entire output, in the event the agency adopted be not the Federal Trade Commission, but, as was the fact, the Fuel Administration? It will be found in the fourth paragraph, above quoted, of the section, if that paragraph be transposed, so as to follow the paragraph authorizing the President to require the sale of the entire products, in designated areas, to the United States. If what is now paragraph 4 be transposed to follow what is now paragraph 6,- it will be seen that full operation can be given to the words “that if the prices so fixed,” appearing in paragraph 4, which plaintiff insists are meaningless, as they noAV stand, unless its views be adopted. As has been said the act authorizes the requisitioning of the plant, and also authorizes the purchasing of the output. In *443 either event, there is an appropriation by the Government; and just compensation is contemplated. There is, accordingly, provision for paying 75 per cent of the amount ascertained if the output is purchased, or 75 per cent of the amount determined-for the use of the plant if it be requisitioned, and suit for such additional amount as will, in either case, make “just compensation.”
The contention of plaintiff requires an interpolation that a body without legislative powers is not authorized to make. That the transposition of paragraph 4 may be made, in order to effectuate the legislative intention, is clear. Suth. Stat. Const., sec. 260; State v. Turnpike Co., 16 Ohio St., 308, 320; Postmaster General v. Early, 12 Wheat., 136, 152; Church of the Holy Trinity v. United States, 143 U. S., 457.
The construction we adopt accords with the history of the enactment in its course through the two Houses of Congress.
After its passage by the House, and while the bill was under consideration in the Senate, an amendment was offered which furnished a large part of section 25 as finally adopted. This amendment, as originally introduced, was not drawn by its proponent. (Cong. Record, vol. 55, p. 5313.) As first presented on July 12, 1917, it referred to “coal, coke, petroleum, or any of their products,” but it was amended so as to omit the products other than coal and coke. (Cong. Record, vol. 55, p. 5311.) In its amended form it provided, in one section, for the fixing of the price of these products whenever sold by producer or dealer, and in another for the requisitioning of the plant or business and the operation of the same by the Government, and, following these, was a third section, which provided for suit against the Government in case the prices fixed or the compensation prescribed for the plant or business were not satisfactory to the person entitled to the same. This proposed amendment is set forth at length in the Record, page 5310.' It is noticeable that its third section would logically have followed the fourth section. It is difficult to find, in the debates on the amendment, an indication of a purpose to create a liability on the Government such as is urged in the present case. The proponent of the amendment declared it to be his belief that the operators would be glad to comply *444 with the prices that would, be fixed and that he had shown in a former speech the excessiveness of prices that had been charged for coal and coke. (Cong. Record, p. 5311.) Another Senator who had participated in framing the modified amendment (Cong. Record, p. 5313), addressing himself to the subject of it, said it contemplated that the United States “ shall become the owner of all the coal mined and that it shall pay to the coal operators a fair and reasonable price for it, including the cost of production, maintenance, operation, depletion, and depreciation,” and then resell the coal. This evidently refers to the feature of the amendment providing for the purchase of the entire output by the Government (sec. 5 of the amendment). Another Senator expressed tersely the view that apparently prevailed when he said: “ The Government must either control the prices or purchase the coal and then set it moving. * * *
This bill provides in the alternative for both of these plans.” (Cong. Record, p. 5320.) The amendment was adopted and became substantially section 22 of the bill as passed by the Senate and as it went to conference.
Many changes had been made in the bill and the committee of conference dealt with these, among them No. 69, being the section added by the Senate as section 22. The conference report (Cong. Record, p. 5733) shows that in lieu of the Senate amendment there was inserted section 25 as it now appears in the act. The statement of the managers on the part of the House, which was made in accordance with the House rule, providing for a statement to accompany a conference report, and intended to acquaint the members with the effect of the report, states (Cong. Record, p. 5738) that the Senate amendment inserted a new section “providing for comprehensive governmental control of the coal and coke business, including the fixing and regulating of prices, the requisitioning and operating of plants and business, the governmental purchase and sale of coal and coke, and a detailed investigation of the coal and coke business,” and added:
“ The House recedes and agrees with an amendment changing the section number to 25; limiting the operation of the section to the period of the. war; extending fhe power of *445 regulation by the President to include the method of production in addition to the sale, shipment, distribution, apportionment or storage of coal and coke; eliminating recourse to the Board of Mediation and Conciliation by any person dissatisfied with wages fixed by the President; reducing the amount to be paid to any person dissatisfied with the compensation fixed in the exercise of the requisitioning or purchasing power to 75 per cent instead of the entire amount, with the right to sue the United States to recover such further sum as added to said 75 per cent will constitute just compensation; eliminating the provision that there shall be but one dealer between the producer and consumer in fixing maximum prices for dealers; and making other changes of a minor or incidental nature.”
The history of the act and the statement to the House clearly show that the part of the amendment as originally introduced in the Senate, which refers to suits against the United States for compensation additional to that resulting from fixed prices, was dealt with by an elimination of that feature, and there was provided a right to accept 75 per cent of the compensation “ fixed in the exercise of the requisitioning or purchasing power,” and to sue for such additional sum as would give just compensation. The section, as rewritten, omits the statement originally therein of the reason for its enactment and leaves the general and more comprehensive purpose as stated in the first section of the act to apply. But' the section as rewritten also deals, as has been mentioned, with two classes of taking and price fixing — the one referring to the requisitioning of the plant or business, and the other to the purchasing of the entire output of the producer. The statement of the managers on the part of the House acquaints the Members with this condition, but makes no mention of any provision or purpose, in the act, to subject the Government to liability on account of the fixing of prices between producer or dealer and consumer.
The court is not warranted in importing phrases into the act that will make it mean something different from what it says and different from, what the House Members were told it meant; nor can the court say that, because the act contains words that appeared in the amendment as it passed the Senate, the related words that were therein should be *446 considered as still a part of the section, when, as a matter of fact, the amendment was dealt with, changed in conference, and the entire scope of the related words was materially altered.
It is our conclusion that the Lever Act does not create a liability on the United States to producers of coal who sold their product at prices fixed by the Government, and it follows that the demurrer should be sustained. And it is so ordered.
Graham, Judge; Hat, Judge; DowNet, Judge; and Booth, Judge, concur.