### COMMERCIAL CABLE CO. v. BURLESON et al. *

### COMMERCIAL PACIFIC CABLE CO. v. SAME.

(District Court, S. D. New York. January 10, 1919.)

1. TELEGRAPHS AND TELEPHONES ⟶26¾ [New, vol. 7A Key-No. Series]—ASSUMPTION OF CONTROL OF CABLES BY GOVERNMENT—LEGALITY.
   Under Joint Resolution July 16, 1918 (Comp. St. 1918, Append. § 3115¾x), authorizing the President during the continuance of the war, "whenever he shall deem it necessary for the national security or defense," to take possession and control of marine cables, the determination by the President that such necessity exists is not subject to judicial review.

2. TELEGRAPHS AND TELEPHONES ⟶26¾ [New, vol. 7A Key-No. Series]—ASSUMPTION OF CONTROL BY GOVERNMENT—LEGALITY.
   Joint Resolution July 16, 1918 (Comp. St. 1918, Append. § 3115¾x), authorizing the President during the continuance of the war to take possession and control of telegraphs and marine cables, is within the constitutional powers of Congress, is not unconstitutional because compensation for their use is deferred and to be fixed initially by the President, and was an appropriate war measure, as placing in the President's control as chief executive and head of the army and navy an essential instrumentality both for military and naval operations and in negotiation of a peace treaty.

3. WAR ⟶33—CONCLUSION—"ARMISTICE."
   An "armistice" is merely a suspension of military operations, and has no effect to terminate the war.

In Equity. Suits by the Commercial Cable Company and by the Commercial Pacific Cable Company against Albert S. Burleson and Newcomb Carlton. On motions to dismiss bills. Motions sustained.

These cases arise on motions to dismiss two bills in equity for lack of jurisdiction and for want of equity, and they therefore present cases based altogether upon the allegations contained in them. Each bill was similar, and the consideration of one may be taken as applicable to both. They prayed an injunction against the defendants from interfering with the plaintiffs' property or business of which they had claimed to take possession.

The Commercial Cable Company's bill alleges that it was a corporation of the state of New York, doing business in the city of New York, and engaged in the operation of a system of submarine cables in the Atlantic Ocean to Canada, Newfoundland, the Azores, United Kingdom, and France; that on the 16th of July, 1918, the Congress of the United States by joint resolution (Comp. St. 1918, Append. § 3115¾x) authorized the President during the con-

---

⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
Reversed 250 U. S. 360, 39 Sup. Ct. 512, 63 L. Ed. —.

tinuation of the present war, whenever he should deem it necessary for the national security and defense, to take possession of any marine cable and operate the same for the duration of the war, and not beyond the date of the proclamation by the President of the exchange of the ratifications of the treaty of peace; that on the 11th day of November, 1918, an armistice was signed, suspending hostilities during the present war, and immediately thereafter the duration of the war, within the purpose of the resolution, terminated; that on the 16th of November, 1918, the defendant Burleson, assuming to act under a proclamation of the President, took possession of the plaintiff's cables, and also of the cables of the Commercial Pacific Cable Company, the other plaintiff, from San Francisco to China, Japan, and the Philippines, and to South America from the city of New York; that the proclamation of the President, on which the defendant Burleson acted, was dated November 2, 1918, a copy of which was annexed, and asserted that the President deemed it necessary for the national security and defense to take possession of all marine cable systems in the country; that the seizure was illegal and void, because the war had terminated within the meaning of the resolution, because Congress had no power to authorize possession to be taken under the circumstances existing at that time, because it was not necessary for the national security and defense to deprive the plaintiff of its property without due process of law and without compensation, because it was not for any public use, and because the defendant Burleson was not an impartial tribunal to determine the plaintiff's compensation for the use of the cables; that proper and legal provision had not been made for the plaintiff's compensation, and that the purpose was to consolidate the plaintiff's system with that of its competitor, the Western Union Telegraph Company, in violation of the Anti-Trust Act of Congress, and to suppress competition between the two; that full, adequate, complete, quick, and correct cable service had been given by the plaintiff throughout the period of the war to the government, whose messages had taken precedence over all others; that there had been no complaint on the part of the government, nor was there any occasion therefor, in the quick and accurate transmission of its messages; that the plaintiff's cables had been worked to their utmost capacity by a competent staff of officers and operators; that the service could not be increased and bettered; that the operation of the cable lines under the control of the defendant Burleson would be less efficient and satisfactory to the government and the public, and that the ground given for the seizure was a mere pretext, without substance or basis; that the cables had theretofore been under the absolute control of officials of the United States, and that nothing had been done by the plaintiff in their operation without the knowledge and approval of the Director of Naval Communications, whose every request and suggestion had been complied with by the plaintiff in every particular; that the plaintiff had co-operated in a most rigid censorship, which was established by the government, and had met all demands and requests of the government fully and completely; that the transmission of cablegrams between America and Europe did not necessitate or justify the seizure of 10,000 miles of cable between San Francisco, China, Japan, and the Philippines, or the seizing of the cables from New York to South America, nor of those to Cuba and Mexico, nor the seizing of 13 cables across the Atlantic; that the seizing of such 13 cables did not facilitate in the slightest degree the transmission of government messages; that they had been already worked to their utmost capacity, as fully and efficiently as they could be worked if operated by the government; that the joint resolution of Congress was unconstitutional, in that compensation was not provided before an impartial jury or commission; that the defendant Burleson was an improper and unfair tribunal to make a provisional estimate of the plaintiff's damages; that the appeal to the Court of Claims was illusory, because no provision was made for paying any judgment that the plaintiff might obtain; that there was no compulsory process by which a judgment of the Court of Claims could be collected, and that it was entirely voluntary with Congress whether such judgment should be paid or not; that the defendant Burleson intended to consolidate the plaintiff's business with

that of the Western Union Telegraph Company, so that its separate identity and business would disappear, and the plaintiff would be forced to abandon competition thereafter and acquiesce in the defendant Burleson's plans for government ownership of the same—all in violation of the Sherman Act.

The joint resolution under which the President acted contained a provision that just compensation should be made for possession of any cable seized, in an amount to be determined by the President, and if the amount so determined was unsatisfactory the person interested might receive 75 per cent. of the amount so determined and should be entitled to recover such further sum as might be awarded in accordance with section 24, par. 20, and section 145 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1093, 1136 [Comp. St. § 991, par. 20, and section 1136]). The first of these provisions authorized suits to be brought in the District Court, and the second a suit to be brought in the Court of Claims upon claims of similar character.

By amendment to the bills the name of the defendant Carlton was added wherever the defendant Burleson's name appeared, and an allegation was also added that the landings of some of the cables were in foreign countries, and seizure of them by the United States would constitute a violation of international law, of which all nations were properly jealous; that, if such seizure was obtained by consent, the consent would constitute in substance a treaty, which could only be made with the concurrence of the Senate, whose consent had not been obtained.

There were also, coupled with the motions, motions to strike out certain parts of the bill as irrelevant, impertinent, and scandalous; but in view of the disposition made of the case these motions need not be set forth.

Edward F. McLennan, Harold Harper, of New York City, and Charles N. Bracelin, for the motions.

Charles E. Hughes and William W. Cook, both of New York City, opposed.

LEARNED HAND, District Judge (after stating the facts as above). I shall dispose of this case upon the merits, and without considering two questions raised which go to the jurisdiction of the court. The first is that the bills pray for injunctions against the United States; the second, that they are in effect directed against the President. The second question involves this: Whether a court should pass a decree which directly contradicts an order made by the President, but which must necessarily be enforced only through sanctions dependent upon his execution of the writ. As the merits of the case involve questions of importance, it appears to me more desirable to base my decision upon them, only premising that the preliminary objections I pass without deciding.

The theory of the bills is twofold: First, that the seizure of the cable lines on November 16, 1918, was not justified by the joint resolution of July 16, 1918; second, that the resolution itself was an insufficient warrant, though its terms had been followed. I shall consider these in their order.

[1] The joint resolution authorized the President to seize any cables when he deemed it "necessary for the national security and defense," and the bills insist that the issue is justiciable in this court whether there was any such necessity. The scope of the court's inquiry need not concern me, for, if no inquiry whatever is possible, its scope is irrelevant. The plaintiffs assume, under the rule in such

cases as Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294, American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90, Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525, Union Bridge Co. v. U. S., 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523, Interstate Commerce Comn. v. L. & N. R. R. Co., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431, and Gegiow v. U. S., 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114, that the grant given by the resolution of Congress is in effect limited by its right to delegate general legislative power. If so, they say, it can be extended only so far as to depute to an official, whether or not he be the President, the duty of ascertaining a fact, or some facts, which Congress has made a condition upon the incidence of the legislative act. Moreover, since that incidence is dependent upon an actual exercise of some intelligible decision upon the fact confided to the public official, his decision is reviewable to this extent: That there must be a tenable basis in the evidence from which a reasonable man could have reached the same conclusion. Thus it becomes justiciable, though to a limited degree.

If it be admitted that the joint resolution falls within this class, it might still be contended that under the latitude extended to the rule in cases like Buttfield v. Stranahan, supra, and Union Bridge Co. v. U. S., supra, the question of fact intrusted to the President could be considered to involve all those matters of public policy which made up the national security and defense. In these cases it was held proper for Congress to depute to officials the power to establish standards or norms of conduct to which the public must conform. This was certainly a very different duty from ascertaining whether a fact defined in general language had occurred. Even so, the decision would be justiciable, and it would become necessary to consider the allegations in the bills; but I do not rely upon any such extension of the rule, because the joint resolution does not fall into the class of legislation which these cases control. It was not a rule for the future conduct of individuals, like most legislation; it was the sovereign act of condemning the temporary possession of private property for public use, rather administrative than legislative in its nature, as those terms are generally used, though it must, of course, proceed from Congress. As such the question is whether the use to which the property was condemned was a public use within the accepted rules, and how that use should be defined.

I may assume for the moment that the use intended was to put the property at the general disposal of the President in the discharge of some of his constitutional functions, without inquiry as to the specific purposes which he might have in mind. It is true that Congress might, if it chose, have required the President to state the occasion which he thought made his possession necessary and the uses to which he would put it; but that is not the point. If he had asked of Congress the immediate possession of the cables, would it have been lawful for them to consent to that possession, without reserve or question? Had he been a private person, this clearly would not be the case;

some public use must have been disclosed, and the possession dedicated to it alone. The President is, however, vested by the Constitution with certain duties in whose discharge he is exempt from inquiry by courts. His discharge of those duties as the Constitution imposed them is in the highest sense a public use, and the committal to him of means to discharge them falls into the same category. Therefore, if the President had asked of Congress the possession of property for use in his capacity, for example, as commander in chief, it would have been as lawful for them to intrust it to him without condition as though they appropriated money for his disbursement.

If so, there was no reason why they should not have suspended the time of possession until in his judgment it became advisable that he should acquire it. Into the occasion of his necessity they need as little inquire as though he had asked for it at once. All that was necessary was that he should ask for it in some capacity which the Constitution recognized. Furthermore, it is not necessary that the capacity should be expressly stated, so long as it is apparent that the property condemned was in its nature appropriate to the exercise of some constitutional function. I must assume that, when he required it, he required it by virtue of some constitutional power, so long as that might have been the case.

The question is therefore rather of the power of Congress to condemn property for the President's use within his limited powers, than of his exercise of them. The latter in any event must be exempt from impediment by individual interests before courts. If Congress have not the power, obviously it cannot put into the President's hands those instruments which may be essential to the discharge of his duties, except upon condition that he submit to a control from which in other respects he is exempt. That the Constitution should prescribe so unworkable a system seems to me unthinkable. Without the co-operation of Congress the President is substantially without means to exercise his prerogative. If he must justify before courts any occasion he may have to accept their assistance, government becomes in the final analysis not one of laws, but of courts. Cases such as Mitchell v. Harmony, 13 How. 115, 14 L. Ed. 75, and U. S. v. Russell, 13 Wall. 623, 20 L. Ed. 474, are quite different. There the power depended upon the common law, which imposed upon its exercise the condition that the emergency was actual. It became necessary to scrutinize the decision of the officer exercising the power, to ascertain whether it existed.

Having such power, did Congress intend to bestow upon the President possession at his mere assertion that he wished it? Without doubt. The language of the resolution is that he may seize the cables "whenever he shall deem it necessary"; his conclusion is the single condition. The occasion lent color to this interpretation. The war was at its height; the nation was using every energy and resource towards its effective prosecution. The President, as its executive head, was responsible for its success, and the purpose of concentrating in him a power commensurate with that responsibility was obvious in all contemporary legislation. That Congress should have contemplat-

ed the possibility that he should be compelled at the suit of an individual to disclose and justify the reasons for his act is beyond possibility. He had to act quickly, certainly, and without the trammels of courts or private interests.

[2] Are there, then, constitutional powers of the President to whose discharge the possession of such property was suitable? If for the moment one considers the question if it had arisen before November 11, 1918, the answer is immediate. Cable lines leading to the theaters of war, Europe and Asia, were obviously appropriate to the conduct of military operations. I need hardly expatiate upon the vital necessity of rapid communication to military success. Nor does it make the least difference whether the plaintiffs are right in saying that they were already giving as good service as could be obtained under governmental control. The single question is whether they possessed an instrument available for military use; if so, the President, as commander in chief, had the sole power to determine whether it was wiser to acquire possession or to operate it otherwise. Nor do the cables leading elsewhere introduce any difficulty. The cables were already in one system of management and under one control, and it was not essential that only those which were immediately important to actual military operations should be taken. If the operation of those immediately necessary would be facilitated by possession of all, that was enough. But, indeed, it would be a lame comprehension of the scope and variety of modern war, which limited its activities to the immediate theater of military operations. The espionage system of the enemy, we are told, was not limited to belligerents—at least it may be so. Provisions for supplies and matériel could not be made without an eye to the resulting scarcity at home and the available substitutes abroad. In a war which has called for the last resources of the belligerent powers, and where the United States was in active military co-operation with many of these belligerents, it is quite impossible to say that means of telegraphic communications anywhere in the world were not appropriate to its prosecution. If the President, who by virtue of his office was charged with the successful conduct of the war, decided that any such means were necessary, his decision was final.

[3] The plaintiffs do not, however, take that position. They rely upon the fact that after November 11, 1918, the war was from a military aspect closed, and that the powers of the President had changed. By virtue of what fact did they change? Not by the intent of Congress, because the resolution expressly extends the powers until peace has been declared. Had they intended that a suspension of hostilities should terminate the right, they would not have said precisely the contrary. Nor did they change by any limitation of the Constitution that I know. Even if I were to assume that the power were only coextensive with a state of war, a state of war still existed. It is the treaty which terminates the war. The Protector, 12 Wall. 700, 20 L. Ed. 463; Hijo v. U. S., 194 U. S. 315, 24 Sup. Ct. 727, 48 L. Ed. 994. An armistice effects nothing but a suspension of hostilities;

the war still continues.[1] It is true that a war may end by the cessation of hostilities, or by subjugation; but that is not the normal course, and neither had hostilities ceased, nor had the enemy been subjugated in the sense in which that term is used. There were still military operations, the armistice had not been carried out, and after it was, armed forces of the United States were in occupation of enemy territory, and were in European and Asiatic Russia, where, indeed, they still remain. The President was still in command of these forces, and to their conduct telegraphic communication was still essential. All that the armistice could do was to introduce a new, though very vital, consideration into his decision; but it did not affect its finality. A court might conclude that there was no basis for the seizure, but a court would have as little right to entertain the issue before as after the armistice.

There is, moreover, another constitutional power of the President, under which the seizure was justified, and which also depends upon the existence of war—his initiative in the making of treaties. War is not the release of primitive combative instincts; it is an enterprise conducted for purposes consciously understood, whose realization gives to it its only rational significance.[2] The national security and defense is to be judged not by the immediate present, but by the sta-

---

[1] Oppenheim, International Law, vol. 2, War, §§ 231, 233, 260–266.

Section 231: "Armistices or truces, in the wider sense of the term, are all agreements between belligerent forces for a temporary cessation of hostilities. They are in no wise to be compared with peace, and ought not to be called temporary peace, because the condition of war remains between the belligerents themselves, and between the belligerents and neutrals on all points beyond the mere cessation of hostilities. In spite of such cessation the right of visit and search over neutral merchantmen therefore remains intact, as does likewise the right to capture neutral vessels attempting to break the blockade, and the right to seize contraband of war."

Articles 36 and 37 of the Fifth Convention at the Second Hague Conference are as follows (translation):

"Art. 36. An armistice suspends military operations by mutual agreement of the belligerents. If its duration is not determined the belligerents may resume such operations at any time provided always that the enemy is advised within the agreed time and in conformity with the conditions of the armistice.

"Art. 37. An armistice may be general or local. The first everywhere suspends military operations between the belligerent states, the second only between certain parts of the belligerent armies and within a fixed radius."

[2] Oppenheim, op. cit. § 54: "War is the contention between two or more states through their armed forces for the purpose of overpowering each other and imposing such conditions of peace as the victor pleases."

Section 66: "Ends of war are those objects for the realization of which a war is made. In the beginning of the war its ends are determined by its cause or causes, as already said. But these ends may undergo alteration, or at least modification, with the progress and development of the war. No moral or legal duty exists for a belligerent to stop the war when his opponent is ready to concede the object for which war was made. If war has once broken out the very national existence of the belligerents is more or less at stake. The risk the belligerents run, the exertion they make, the blood and wealth they sacrifice, the reputation they gain or lose through the changing fortune and chances of war—all these and many other factors work or may work together to influence the ends of a war so that eventually there is scarcely any longer a relation between them and the causes of the war."

bility of the ensuing state of peace. The terms of the final conventions, the success of the nation in achieving the aims with which it set out, and which it may have adopted during the progress of war, are the measure of that security and defense. Those aims, whatever they are, are deemed essential to some vital national interest, not necessarily confined to freedom from immediate invasion. It may destroy the armed opposition of the enemy and wholly fail in securing its defense of those interests. The President is charged, by his function of negotiating, for presentation to the Senate, a treaty of peace, with the duty of reducing to preliminary form the success which the arms of the nation may have made possible. His right to hold the cables for such purposes, if valid at all, certainly was not affected by the armistice.

Had the possession of the plaintiffs' cables any relation to the negotiation of peace? Obviouly the possession of some telegraphic communication is essential, leading not only to the immediate place where the negotiations may go on, but to any part of the world which may be affected by, or may affect, the result. Many nations have been involved; many may intervene in the conference; no one can at the moment predict to what part of the world immediate, secret, and rapid communication may become a vital necessity for the success of the nation's purposes. Again, as in assistance to the conduct of war, if the cables be appropriate to a discharge of the President's constitutional duty, the number seized and the service rendered under governmental operation is not open to examination. The decision may be wrong; it may even be actuated by purposes other than those intended by Congress; but the relief is not from judges. The considerations which might dictate it are so obviously political in character as to preclude the possibility of their public disclosure or of their judicial determination. If possible, they are more foreign to the questions which courts may settle than those determining the propriety of the seizure of an instrument of active warfare. Whatever means are in their nature available to the successful conduct of negotiations are open to the President to use while negotiating, if Congress chooses to put them at his disposal.

It is true that, if the issues were justiciable, I am not prepared to say that the allegations of the bills would not present a case. Taken favorably, as I must take them, they say that the plaintiffs have given a service which in speed, in volume, in organization, and in secrecy has been all that the property is capable of giving. I take this to include either separate operation or joint control. In any event, the defect, if it were strictly a defect, could be supplied by amendment. It is plain that marine cables cannot be used for anything but the transmission of intelligence, and such allegations seem to me unavoidably to present for determination whether the change in possession could improve the character of the service, and so be necessary to the security and defense of the nation in the only respect in which it could assist in that defense. If that question were open to courts at all, I cannot think of any assertions which would better serve to open it. The defendants' argument that a trial might involve polit-

ical considerations improper for disclosure only goes to the propriety of any trial at all, not to the necessary inference from the allegations, if they be true. If true, there was no public necessity; hence the issue is well framed, if it is justiciable. I hold that it is not.

The remaining question is simply of the adequacy of the provisions for compensation. The allegations touching the partiality of the defendant Burleson are irrelevant. He will not make the preliminary estimate of the compensation due, but the President, who has not yet even deputed the defendant to advise him. But the whole question is irrelevant in any case, because of the resort given to the Court of Claims. If that be adequate, the resolution is valid. Upon that question I am concluded by the decision of the Supreme Court in Crozier v. Krupp, 224 U. S. 290, 32 Sup. Ct. 488, 56 L. Ed. 771. The language upon which the plaintiffs rely to distinguish that case does not appear to me to indicate that a similar provision here should be considered inadequate. It occurs upon page 306 (32 Sup. Ct. 492) and refers to the intangible nature of the property taken, its possible importance to conduct of the government, and the pledge of good faith for payment. Of these the second two certainly apply in the cases at bar, and the first as well, as I understand the opinion. I assume that the reason why the Chief Justice referred to the intangible character of the property taken was because it was impossible in advance to determine its value. The value of the temporary possession of the plaintiffs' cables is as difficult of ascertainment. It was necessarily uncertain when that possession would begin and how long it would continue. How great would be the damage done could be ascertained only after a calculation which could not even approximately be made in advance. Pressing necessities of the most vital nature required the power to be given, and did not admit of any preliminary appropriation. The same statute was considered in Cramp & Sons v. Curtis Turbine Co., 246 U. S. 28, at page 42, 38 Sup. Ct. 271, 62 L. Ed. 560, and its scope somewhat limited; but it is clear that the court meant to repeat its decision that, when a public officer of the United States takes a patent right, it was by virtue of the right of eminent domain, and that a resort to the Court of Claims was adequate compensation. At least in the face of those declarations it would be an obvious impropriety for a District Judge to hold otherwise.

I conclude, therefore, that the seizure was within the powers conferred by Congress, ancillary to the constitutional powers of the President, whose execution it was intended to assist, and that the joint resolution gave adequate compensation. Of the proposed conduct of the defendant in consolidating the cables under one management, whether or not it be in contravention of the Sherman Act, the plaintiffs are not in a position to complain.

The motions are granted, and the bills will be dismissed, with costs.