UNITED STATES v. WESTERN UNION TELEGRAPH CO.

(District Court, S. D. New York. February 25, 1921.)

Constitutional law ☞76—Authority over cable landings legislative and not executive.

The President is without constitutional power, in the absence of authority from the legislative department, to prohibit the landing of a submarine cable from a foreign country on the coast of the United States or otherwise making connection with its internal telegraph system, and, conceding that Congress by long acquiescence has impliedly given authority to the Executive to prevent the landing of a cable by a foreign corporation, such authority does not extend to the case of a domestic company having a federal franchise under Post Roads Act July 24, 1866 (Comp. St. §§ 10072-10077), and which has for many years operated internal telegraph lines and the cables between Florida and Cuba constructed by express provisions of Act May 5, 1866, and over which Congress has at various times exercised its authority, directly and through the Interstate Commerce Commission, in regulating its rates over both its internal lines and its cable connections.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the United States against the Western Union Telegraph Company. On motion for preliminary injunction. Motion denied, and restraining order vacated.

Order affirmed 272 Fed. 893.

This is a suit in equity brought by the United States against the Western Union Telegraph Company to prevent it from making an alleged unauthorized cable connection between the shores of the United States and a foreign country. In July, 1919, the Western Telegraph Company, a British corporation, made a contract with the Western Union Telegraph Company whereby the former agreed to lay a submarine cable from Para, in Brazil, or such other point on its existing east coast system as it might select, to Barbados. The Western Union likewise agreed to lay and maintain a submarine cable from Miami, Fla., or some adjacent point, to Barbados. The parties to the agreement likewise contracted to equip a joint station to be maintained at Barbaoos by the Western Union Telegraph Company and respectively to transmit messages over the resulting "through line" to such parts of South America and Europe as might be practicable. The agreement fixes through rates from Brazil, Argentina, Paraguay, Uruguay, Chile, Bolivia, and Peru to New York.

In order to carry out this agreement, the British company constructed its line of cable from Brazil to Barbados, and the Western Union caused tne cable ship Colonia to proceed to Miami, Fla., for the purpose of laying a cable from that point to Barbados, to connect with the British line. The Colonia was stopped off Miami by United States destroyers and warned not to lay her cable within three miles of Miami Beach. She thereupon proceeded to lay the cable from a point just outside the three-mile limit off Miami Beach, southward to Barbados. The end of this cable still lies in the sea three miles off Miami Beach, and the Naval Forces of the United States are standing by to prevent the connection of that cable with the shore. The Western Union having failed to land this cable, planned to splice into it a branch cable to connect at Cojimar, Cuba, with three cables which had been theretofore, and are now, being maintained and operated by the Western Union from Cojimar, Cuba, to Key West, Fla., for the purpose, as the United States contends, of thereby making a cable connection between Brazil and the shores of the United States.

Two of the three cables operated by the Western Union from Key West to Cojimar were laid in 1886 and 1899, respectively, to replace cables theretofore laid. These cables, and the ones that they replaced, were laid, maintained, and operated without any presidential permit. The third cable was laid in the year 1917 under a presidential permit, which contained the following provision: "(5) That the consent hereby granted shall be subject to any future action of the President or of Congress, affirming, revoking, or modifying, wholly or in part, the said conditions and terms upon which the consent is given, and subject also to any conventions between the United States and Cuba applicable to said cable line."

The original cables, of which the first two were replacements, between Key West and Cojimar, Cuba, were laid by the predecessor in interest of the defendant pursuant to a Special Act of Congress, approved May 5, 1866 (14 Stat. 44), authorizing the laying of such cables between Florida and Cuba. The third cable between Key West and Cojimar, laid in 1917, is alleged by the defendant to have been authorized under the General Act of Congress of July 24, 1866 (Comp. St. §§ 10072–10077), with the approval also of the War Department under the Act of March 3, 1899 (the River and Harbor Act [30 Stat. 1121]).

The cable attempted to be laid between Barbados and Miami Beach is likewise said by the defendant to be authorized by the Act of Congress of July 24, 1866. The formal authorization of the Secretary of War has been signed, but is withheld because the Executive has refused his approval of the proposed connection involved.

The interference by the government with the laying of the last-mentioned cable and with the splicing into it of a branch cable to connect at Cojimar, Cuba, with the present three cables that are landed at Key West, is justified upon the ground that the President disapproves of a connection between the

lines of the defendant and those of the Western Telegraph Company, because that British company, by grant of the Brazilian government, has exclusive rights in the ports of Brazil at which it has established offices.

The President has issued to the Western Union a modified permit covering the three Key West cables and containing a condition that the cables should not be used as a link in a line connecting the shores of the United States with a line enjoying an exclusive foreign monopoly. The Western Union has refused to accept this modified permit.

The Western Union heretofore brought a suit in the Supreme Court of the District of Columbia against the Secretary of State, the Secretary of War, and the Secretary of the Navy to enjoin them from interfering with its acts, and moved therein for an injunction pendente lite, which motion Judge Stafford has taken under advisement.

As the United States was not a party to the suit brought in the District of Columbia, it could obtain no affirmative relief therein. This suit was accordingly brought.

Francis G. Caffey, U. S. Atty., of New York City (Earl B. Barnes, of New York City, of counsel), for the United States.

Rush Taggart, of New York City (Joseph P. Cotton and Francis R. Stark, both of New York City, of counsel), for defendant.

AUGUSTUS N. HAND, District Judge (after stating the facts as above). Two questions of law arise: (1) Whether in the absence of congressional legislation the President has the power to prevent unauthorized cable landings on the shores of the United States or the operation of cable lines connecting with foreign countries in a way contrary to executive policy. (2) Whether there is any congressional legislation under which the defendant may validly operate. If there is, all parties concede that no executive permission is necessary.

The right of the United States to secure a judicial decision as to the legality of the steps proposed by the Executive, and, if they be lawful, to secure injunctive relief against the defendant, is not questioned by any of the parties to this suit, and seems to be warranted by the decision of the Supreme Court in the case of In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092.

If the President has the original power sought to be exercised, it must be found expressly, or by implication, in the Constitution. It is not sufficient to say that he must have it because the United States is a sovereign nation and must be deemed to have all customary national powers. Knox v. Lee, 12 Wall. 457, 20 L. Ed. 287. However true this may be, it does not follow that the Executive has the necessary authority. Certainly many, if not most, executive powers flow from legislative enactments. There is no doubt that Congress, by virtue of its authority to regulate foreign commerce, could regulate the laying and operation of cables, and has often done this. I cannot regard a failure by Congress to exercise its undoubted powers as proof that some other branch of the government has the right to do what Congress might readily have authorized.

The powers of the President are set forth in article 2 of the Constitution. Section 1, subd. 1, of that article, provides that "the executive power shall be vested in a President of the United States of Ameri-

ca.  \*  \*  \* "  Subdivision 7 requires that before the President enters on the execution of his office he shall take the following oath or affirmation:

"I do solemnly swear (or affirm) that I will faithfully execute the office of President of the United States, and will to the best of my ability, preserve, protect and defend the Constitution of the United States."

By section 2 the President is made commander-in-chief of the army and navy and is given power by and with the advice and consent of the Senate to make treaties and to appoint ambassadors and other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States whose appointments are not otherwise provided for in the Constitution and which shall be established by law.

By section 3 the President is given the right to receive ambassadors and other public ministers, and it is provided that "he shall take care that the laws be faithfully executed.  \*  \*  \* "

It is reasonably plain from the foregoing enumeration of the President's powers that such decisions as In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55; Chinese Exclusion Case, 130 U. S. 581, 9 Sup. Ct. 623, 32 L. Ed. 1068; and Fong Yue Ting v. United States, 149 U. S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905, do not dispose of the questions involved in the present controversy.  In the above cases Congress had passed laws for the carrying of the mails, the holding of Circuit Courts, and the exclusion of aliens.  The Executive Department of the government in every case was enforcing these laws or seeing that enforcement was not impeded, and the court in substance held that such action was necessarily within the executive prerogative.  The constitutional grant of general executive power, and the specific provision that "he shall take care that the laws be faithfully executed," each necessarily called for the judicial decisions which were rendered.

The power here invoked is far more doubtful than in the instances I have cited where it could be justified as an executive enforcement of legislative provisions.  In this case, if it exists at all, it must be derived by implication from the sweeping grant of general executive power which, the Constitution says, "shall be vested in a President," and by the special authority to make treaties and appoint ambassadors by and with the consent of the Senate, and to act as commander-in-chief of the army and navy.

It can hardly be doubted that the President as commander-in-chief of the army and navy could repel any forces coming to this country with apparent hostile purpose, even though no war had been declared by the Congress.  If there should be any reasonable basis for regarding such an attempt as imminent, the matter doubtless would be non justiciable because it would be then the prerogative of the President to determine the degree of danger and the necessary means to be employed to avert it.

While it is contended by the government that the control of cables would be useful in time of war, it is nowhere suggested that there is

any hostile purpose in the attempt to land the cables of the Western Union at Miami Beach.

Under the war power, as was said by Judge Learned Hand in the case of Commercial Cable Co. v. Burleson (D. C.) 255 Fed. 99, Congress can empower the President to seize cables and can delegate to him the absolute determination as to the necessity of doing this, but it does not appear from the opinion in that case that the President, either in the exercise of the delegated legislative powers given him by Congress or in the exercise of his constitutional power to negotiate treaties, could seize cables even in time of war without legislative authority. A different question might, of course, arise if the President as commander-in-chief of the army and navy were obliged in order to conduct military operations to seize cables, without congressional authority, that were found within the field of military operations itself.

The implications of the power contended for by the government are very great. If the President has the right, without any legislative sanction, to prevent the landing of cables, why has he not a right to prevent the importation of opium on the ground that it is a deleterious drug, or the importation of silk or steel because such importation may tend to reduce wages in this country and injure the national welfare? In the same way, why does not the President, in the absence of any act of Congress, have the right to refuse to admit foreigners to our shores, and to deport those aliens whose presence he regards as a public menace? While the prerogative of the British Crown in respect to the admission and deportation of aliens is not clearly ascertainable, its right, in the absence of an act of Parliament, to refuse permission to aliens to enter British territory was contested by Sir W. Phillimore on behalf of the alien in 1891, in the case of Musgrove v. Chun Teeon Toy (L. R. 1891, A. C. 272), and the privy council said that the question involved such important considerations that they would express no opinion as to it, and would decide the case solely under the act of Parliament invoked by the Australian government. Lord Herschell intimated that no authority existed that an alien had a right of action for exclusion from the country.

As eminent an authority as Prof. Dicey makes the unqualified assertion in his book on "The Law of the Constitution" that—

"The crown cannot, except under statute, expel from England any alien whatever, even though he were a murderer, who, after slaughtering a whole family at Boulogne, had on the very day crossed red-handed to Dover. The Executive therefore must ask for, and always obtains, aid from Parliament. An alien act enables the ministry in times of disturbance to expel any foreigner from the country; a foreign enlistment act makes it possible for the ministry to check intervention in foreign contests or the supply of arms to foreign belligerents. Extradition acts empower the government at the same time to prevent England from becoming a city of refuge for foreign criminals and to co-operate with foreign states in that general repression of crime in which the whole civilized world has an interest. Nor have we yet exhausted the instances in which the rigidity of the law necessitates the intervention of Parliament. There are times of tumult or invasion when for the sake of legality itself the rules of law must be broken. The course which the government must then take is clear. The ministry must break the law and trust for protection to an act of indemnity. A statute of this kind is (as already pointed out) the last and supreme exercise of parliamentary sovereignty. It legalizes illegal-

ity; it affords the practical solution of the problem which perplexed the statesmanship of the sixteenth and seventeenth centuries how to combine the maintenance of law and the authority of the houses of Parliament with the free exercise of that kind of discretionary power or prerogative which, under some shape or other, must at critical junctures be wielded by the executive government of every civilized country." (4th Ed.) pp. 339–340.

An act of indemnity somewhat like the one mentioned by Prof. Dicey was upheld by the Supreme Court as a valid act of the Legislature of the Philippine Islands in the case of Tiaco v. Forbes, 228 U. S. 549, 33 Sup. Ct. 585, 57 L. Ed. 960.

Certainly if the prerogative of the British Crown, acting through a ministry which as executive of the nation has been obliged to deal for many generations with the most complex international situations, does not include the right to deport even most troublesome aliens, the existence under the Constitution of an implied executive power of the sort contended for seems most doubtful.

It must be remembered that the Constitution gives only to Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes" (article 1, § 8, cl. 3), and "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof" (article 1, § 8, cl. 18). The government, however, contends that the Executive has the power to prevent the landing of cables and other physical connection of foreign countries with this country, because Congress has long acquiesced in executive regulation of such matters in cases where Congress has not acted. From the time of the administration of President Grant there has been frequent and growing insistence by the Executive upon the right to regulate the landing of cables connecting with foreign countries, and this alleged prerogative has been recently extended to grant permits to light lines, oil lines, telephone lines, aerial railways, and pipes for the disposal of waste from the manufacture of soda ash. The exercise of this executive power has been acquiesced in by various corporations, who perhaps found it easier to accept a permit than to attempt to resist the Executive. President Grant, in a message to Congress in December, 1875, referred to a French company which proposed to lay a cable from the shores of France to the United States. President Grant stated in his message that he could not concede that any power should claim the right to land a cable on the shores of the United States and at the same time deny to the United States or to its citizens or grantees an equal right to land a cable on its shores, and adds:

"The right to control the conditions for the laying of a cable within the jurisdictional waters of the United States to connect our shores with those of any foreign state pertains exclusively to the government of the United States under such limitations and conditions as Congress may impose. In the absence of legislation by Congress I was unwilling on the one hand to yield to a foreign state the right to say that its grantees might land on our shores while it denied a similar right to our people to land on its shores; and on the other hand I was reluctant to deny to the great interests of the world and of civilization the facilities of such communication as were proposed. I there-

fore withheld any resistance to the landing of the cable on the condition that the offensive monopoly feature of the concession be abandoned, and that the right of any cable which may be established by authority of this government to land upon French territory and to connect with French land lines and enjoy all the necessary facilities or privileges incident to the use thereof upon as favorable terms as any other company be conceded. As the result thereof the company in question renounced the exclusive privilege, and the representative of France was informed that, understanding this relinquishment to be construed as granting the entire reciprocity and equal facilities which had been demanded, the opposition to the landing of the cable was withdrawn."

President Grant then set forth conditions which he thought should be exacted before allowing foreign cables to land, and said:

"I present this subject to the earnest consideration of Congress. In the meantime, and unless Congress otherwise direct, I shall not oppose the landing of any telegraphic cable which complies with and assents to the points above enumerated, but will feel it my duty to prevent the landing of any which does not conform to the first and second points as stated, and which will not stipulate to concede to this government the precedence in the transmission of its official messages and will not enter into a satisfactory arrangement with regard to its charges."

There is attached to the moving papers letters from Secretaries of State Fish, Evarts, Blaine, and Day (now Mr. Justice Day) requiring executive permits, as well as from Secretary Bayard and Secretary Root, and Attorneys General Griggs, Knox, Wickersham, and McReynolds (now Mr. Justice McReynolds). The only break in this continuous position taken by the Executive Branch of the government for the last 50 years was during the administration of President Cleveland. Secretaries Gresham and Olney declined to exercise the power upon the ground that presidential action would not be binding upon Congress, and that the President was without power.

In 1898 Acting Attorney General Richards (22 Op. Attys. Gen. 25–27) rendered an elaborate opinion in regard to this matter in which he summarized the position of the government by saying:

"I am of the opinion, therefore, that the President has the power, in the absence of legislative enactment, to control the landing of foreign submarine cables. He may either prevent the landing, if the rights intrusted to his care so demand, or permit it on conditions which will protect the interests of this government and its citizens; and if a landing has been effected without the consent or against the protest of this government, respect for its rights and compliance with its terms may be enforced by applying the prohibition to the operation of the line, unless the necessary conditions are accepted and observed."

Under such circumstances, unless congressional legislation regulating foreign telegraphic business can be invoked, it may be reasonably contended that Congress has acquiesced in the long-continued claims of the Executive.

In the recent case of United States v. Midwest Oil Co., 236 U. S. 459, 35 Sup. Ct. 309, 59 L. Ed. 673, it appeared that there had been an executive practice of long standing to withdraw public lands from sale whenever the President thought best, although Congress had opened them to occupation. This withdrawal had been made pending proposed legislation in spite of the fact that Congress had declared public lands containing petroleum or oil free and open to occupation, ex-

ploration and purchase by citizens of the United States, under regulations prescribed by law. The majority of the Supreme Court (three justices dissenting) held that the long-continued practice of the Executive, with the knowledge of Congress, amounted to a consent by the latter to have the President act as agent over the public domain for the purpose of withdrawing lands from sale. Mr. Justice Lamar, speaking for the majority, remarked that Congress not only has a legislative power over the public domain, but also exercises the powers of a proprietor; that like any owner it may provide when and to whom its land may be sold, and may be·withdrawn from sale. He added:

"The Executive, as agent, was in charge of the public domain; by a multitude of orders extending over a long period of time and affecting vast bodies of land, in many states and territories, he withdrew large areas in the public interest. These orders were known to Congress, as principal, and in not a single instance was the act of the agent disapproved. Its acquiescence all the more readily operated as an implied grant of power in view of the fact that its exercise was not only useful to the public, but did not interfere with any vested right of the citizen."

In the foregoing case of United States v. Midwest Oil Co. the court held that a congressional consent had been established which justified the exercise of executive power in the absence of further legislation. This conclusion was reached in spite of previous expressions both by the President and in the Senate as to the inadequacy of executive power (see President's message of January 14, 1910). In fact, a law had already been passed empowering the President in the future to withdraw lands which did not ratify his former actions, but expressly left the government and individual citizens free to assert their respective legal rights. The present case in some respects resembles United States v. Midwest Oil Co., supra. While the original power of the President in such matters is questionable, the long-continued practice of the Executive, after a formal message to Congress by President Grant regarding foreign cable connections, may indicate their willingness to have the Executive take the kind of action that is here insisted upon in cases where there is no appropriate legislation covering the subject-matter.

Judge Lacombe, in the case of United States v. La Compagnie Francaise, etc. (C. C.) 77 Fed. 495, where a cable company having no franchise under the Post Roads Act was involved, said that—

"Without the consent of the general government, no one, alien or native, has any right to establish a physical connection between the shores of this country and that of any foreign nation. Such consent may be implied as well as expressed, and·whether it shall be granted or refused is a political question, which, in the absence of congressional action, would seem to fall within the province of the Executive to decide."

I have thought it most questionable whether the power of the President to regulate cable connection is expressed or implied in the Constitution, but if Congress, which has control over foreign commerce, has chosen to allow the President to prevent physical connection between the shores of this country and of foreign nations by cables, telephones, radio devices, or pipe lines, the occasion and mode of

such executive action would seem, as Judge Lacombe intimated, to be a political question, I should doubt whether the extent of the President's authority if based not upon an original prerogative but upon congressional acquiescence was a justiciable matter, and whether a court should interfere to define or support it; for the basis of the right would then depend on the interrelations and mutual accommodations of the Executive and Legislative Departments of the government, and not upon strict law (see Musgrove v. Chun Teon Toy, L. R. 1891, A. C., 272).

It remains to inquire whether any acts of Congress justify the defendant's position. The Western Union principally relies upon the Act of May 5, 1866 (14 Stat. at L. 44), the so-called Post Roads Act of July 24, 1866 (14 Stat. at L. 221), re-enacted as section 5263 of the Revised Statutes, and the Interstate Commerce Act.

The first act granted to the International Ocean Telegraph Company a sole franchise to lay and operate cables to Cuba for 14 years. It provided that this company, which is a predecessor of the Western Union, "their successors and assigns, shall have the sole privilege for a period of fourteen years from the approval of this act to lay, construct, land, maintain and operate telegraphic or magnetic lines or cables in and over the waters * * * over which the United States have jurisdiction, from the shores of the state of Florida * * * to the island of Cuba * * * and other West India islands."

It is contended by the Western Union that the foregoing language gave a sole franchise for 14 years covering the first two cables from Key West and embodied by implication a license to operate beyond that time, revocable at the pleasure of Congress. Certainly it would be strange to suppose that Congress intended to require the cables to be removed or abandoned and that it did not after 14 years expect the original lines to be replaced if repairs or improvements were necessary. Less than this involves a supposition so unlikely and unreasonable that both the implications of the situation and the acquiescence of Congress in the operation of two cables from Key West to Cojimar for about 40 years since the limited franchise expired, and for 20 or 30 years since the new cables were laid, leaves no field for executive action. The language of the city ordinance in the case of Des Moines City R. R. v. City of Des Moines (C. C.) 151 Fed. 854, is somewhat different from that in the Act of May 5, 1866. There the city of Des Moines granted a franchise to operate a street railway "for the time, and upon the conditions hereinafter mentioned and prescribed." And by a subsequent section provided that—

"The right herein granted to said company to operate said railway shall be exclusive for the term of thirty (30) years from the time the first mile of said track is laid and cars running thereon. * * *"

The court held that the foregoing grant created a continuing franchise which was exclusive for only 30 years. This case was reversed by the Supreme Court because no federal question was involved by a decision reported at 214 U. S. 179, 29 Sup. Ct. 553, 53 L. Ed. 958. The question there involved was naturally not discussed, and the

decision that the grant created a perpetual franchise rather than a revocable license succeeding the exclusive franchise of 30 years may be doubtful; yet the language of section 10 of the ordinance, taken by itself, perhaps suggests a franchise for a longer period. In any event, the implication of a revocable license is different from that of a perpetual franchise, and should require much clearer evidence.

The Post Roads Act of July 24, 1866 (supra) provides:

"That any telegraph company now organized, or which may hereafter be organized, under the laws of any state in this Union, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may hereafter be declared such by act of Congress, and over, under, or across the navigable streams or waters of the United States: Provided, that such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads."

There is a further provision that government messages shall be entitled to priority, and shall be taken at rates to be fixed by the postmaster general.

An opinion was rendered by Attorney General Williams in 1872 (14 Op. Attys. Gen. 63)—which it is to be noticed was prior to the decision of the Supreme Court in Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 1, 24 L. Ed. 708—that this act was only intended to apply to interior lines of telegraph designed for communication. between points within the United States and not to exterior oceanic lines designed for telegraphic intercourse with foreign lands. But a telegraph line under "navigable streams" and "waters" is generally known as a cable, and waters within one marine league of the shores have been frequently termed "the navigable waters of the United States." While the several states have jurisdiction in some respects over waters within the three-mile limit, their jurisdiction is subject to the paramount power of the federal government over interstate and foreign commerce. See Stockton v. B. & N. Y. R. R. (C. C.) 32 Fed. 9; Illinois Central Ry. v. Illinois, 146 U. S. 435, 13 Sup. Ct. 110, 36 L. Ed. 1018; Manchester v. Massachusetts, 139 U. S. 240, 11 Sup. Ct. 559, 35 L. Ed. 159.

It appears from the record in the Supreme Court in the case of Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 1, 24 L. Ed. 708, that the Western Union had obtained a federal franchise under the Post Roads Act by accepting the restrictions and obligations therein and that its business was foreign as well as interstate. It owned the stock of the International Ocean Telegraph Company, and by means of the two Key West cables of the latter laid under the Act of May 5, 1866, could transmit messages to the island of Cuba. It also owned telegraph lines extending through Nova Scotia, in the Dominion of Canada, and connecting with Europe.

The foregoing Pensacola Telegraph Case apparently sanctions the doing of a foreign business by a domestic telegraph company, which has come in under the Act of July 24, 1866, at least so far as the portion of the business conducted within the United States is concerned.

The Supreme Court, in the Pensacola Case, 96 U. S. at page 9 (24 L. Ed. 708), speaking of the rights of the Western Union under the Post Roads Act, said:

"The telegraphic announcement of the markets abroad regulates prices at home and a prudent merchant rarely enters upon an important transaction without using the telegraph freely to secure information. It is not only important to the people, but to the government. By means of it the heads of the departments in Washington are kept in close communication with all their various agencies at home and abroad, and can know at almost any hour, by inquiry, what is transpiring anywhere that affects the interest they have in charge. * * * There is nothing to indicate an intention of limiting the effect of the words employed, and they are, therefore, to be given their natural and ordinary signification. Read in this way, the grant evidently extends to the public domain, the military and post roads, and the navigable waters of the United States. These are all within the dominion of the national government to the extent of the national powers, and are therefore subject to legitimate congressional regulation. * * *"

The court further remarked in the case of Telegraph Co. v. Texas, 105 U. S. at page 464 (26 L. Ed. 1067), that—

"The Western Union Telegraph Company having accepted the restrictions and obligations of this provision by Congress, occupies in Texas the position of an instrument of foreign and interstate commerce, and of a government agent for the transmission of messages on public business."

Counsel for defendant calls attention to Order No. 3252 of the post office department of July 1, 1920, in which the postmaster general declares that pursuant to the authority vested in him by the foregoing act of Congress approved July 24, 1866, he fixes the rates over the cables of the United States & Hayti Telegraph & Cable Company between New York and South America for the government. It thus appears that this department of the government recognizes the Post Roads Act as giving the right to conduct a foreign telegraphic business over which government rates must be fixed as prescribed by the act.

In the Interstate Commerce Act (Act Feb. 28, 1920, c. 91, 41 Stat. 474), subdivision 1 of section 1, it is provided:

"That the provisions of this act shall apply to common carriers engaged in * * * (c) the transmission of intelligence by wire or wireless; from * * * or to any place in the United States to or from a foreign country, but only in so far as such transportation or transmission takes place within the United States."

It goes on to say at subdivision 3 that a common carrier shall include "all cable companies operating by wire or wireless," and section 15 of the act empowers the commission to fix rates. The commission officially declared its right to fix foreign cable rates in the case of White v. Western Union, 33 Interst. Com. Com'n R. 500.

It is argued that in spite of the Act of July 24, 1866, and the Interstate Commerce Act, by which certain features of defendant's business may be regulated, and although both acts apparently cover telegraphic business originating in this country and destined for foreign countries, yet the power of the Executive remains to prevent a domestic corporation for many years engaged under a federal franchise in a foreign cable business from making new cable connections. It

272 F.—21

may be that the President, before Congress has acted, may exercise this power in respect to a foreign cable company having no congressional franchise. This is claimed to have been substantially the situation in the case of the French Cable Company, decided by Judge Lacombe. But in respect to the Western Union, which by the Act of July 24, 1866 (supra) possesses a federal franchise covering a business with foreign countries and regulated as to rates by an agency of the government created by Congress, it seems unreasonable to hold that Congress has not occupied the field and legislated so generally in regard to this defendant that it has withdrawn it from the exercise of executive power in respect to foreign cable connections. It will be said that while the defendant can take foreign messages and transmit them throughout the United States, it cannot carry or transmit them through a connecting line beyond the shores of this country without permission of the President. My answer is that Congress has gone too far to make this position tenable. It will similarly be contended that domestic corporations which transmit their cable messages to foreign countries have all done this through executive or congressional permission, just as the Western Union Telegraph Company did in the Pensacola Case, supra, through the International Ocean Telegraph Company, which had a special franchise from Congress authorizing it to operate a cable to Cuba. It will be further said that the exercise of executive control has been frequent since the Interstate Commerce Act purported to regulate electric transmission of all kinds, and that in August, 1914, the President established a naval censorship over all radio messages to insure neutrality, and did this with the apparent acquiescence of Congress.

I think the last incident may well have been an original exercise of executive power to enforce the obligation of neutrality, which seems to be an international obligation in a legal sense. United States v. Arjona, 120 U. S. 488, 7 Sup. Ct. 628, 30 L. Ed. 728; The Paquete Habana, 175 U. S. 700, 20 Sup. Ct. 290, 44 L. Ed. 320. It is to be observed that the power in question has never heretofore been exercised in the case of cable companies which at the time subjected themselves to the conditions of the Post Roads Act, except in the case of the Western Union, when the presidential permit for the third Key West cable was issued to it in 1917, without its knowledge or application, and in the case of the Commercial Pacific Cable Company (Commercial Cable Co. v. Burleson). The conditions in the first permit were entirely innocuous and the anti-monopolistic provisions in the second permit have, it is stated, not been enforced. The executive regulation of domestic corporations governed by the Post Roads Act, therefore, comes down to but two instances, neither of which is impressive. I should be more affected by the claims of executive power made from time to time by the eminent officials who have occupied the offices of secretary of state and attorney general if their opinions had been rendered as to the effect of the acts of Congress which I have discussed. As it is, most of them have done little more than follow a precedent set by President Grant under circumstances differing from the present. It is very easy for any official to follow a general departmental custom

when his department has once taken a position and the assertion of the position must be regarded as very different in real weight from the reasoned opinion of the official.

As domestic telegraph corporations subject to the provisions of the Post Roads Act and to the regulations of the Interstate Commerce Commission have apparently been dealt with on only two occasions, the facts of the case do not appear to indicate a continuous current of legal opinion in the Departments of State and Justice which can be said to support the position now contended for by the government, and they certainly do not indicate any conscious acquiescence on the part of Congress in the position now taken.

In spite of all that has been said about physical connections and trespasses, the acts of the defendant amount to nothing more than carrying foreign messages beyond the shores of this country, which it at least initiates in the United States and transmits to the marginal waters under a federal franchise.

Under all the circumstances I think the complaint must fail because: (1) As to the two old Key West cables they were laid and are operated with the consent of Congress evidenced by the Act of May 5, 1866, and by long-continued acquiescence; (2) as to all the cables, including the third Key West cable and the Barbados cable, the defendant has a right to carry on foreign commerce by reason of the Post Roads Act as construed by the Supreme Court in the Pensacola Case. The connection of its lines with cables laid outside the three-mile limit is an act within a field as to which Congress has generally legislated so as to free it from the executive control sought to be exercised.

If I thought any irreparable damage could be suffered by the United States before an appeal could be heard or Congress could legislate, I should be inclined to grant a preliminary injunction even though I differed with the views of the government as to executive power. As matters stand I can see no present danger to national interests, and, believing that the so-called executive power to restrict unauthorized foreign cable connections does not apply to this case, I deny the motion for a preliminary injunction and vacate the restraining order heretofore granted.